## SEA-LAND SERVICES, INC. *v.* GAUDET, ADMINISTRATRIX

No. 72–1019.   Argued November 7, 1973—Decided January 21, 1974

BRENNAN, J., delivered the opinion of the Court, in which DOUG-
LAS, WHITE, MARSHALL, and BLACKMUN, JJ., joined.   POWELL, J.,

filed a dissenting opinion, in which BURGER, C. J., and STEWART and REHNQUIST, JJ., joined, *post*, p. 595.

*Stuart A. McClendon* argued the cause for petitioner. On the brief was *Richard L. Greenland.*

*George W. Reese* argued the cause for respondent. With him on the brief was *George M. Leppert.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

*Moragne* v. *States Marine Lines,* 398 U. S. 375 (1970), overruling *The Harrisburg,* 119 U. S. 199 (1886), held that an action for wrongful death based on unseaworthiness is maintainable under federal maritime law, but left the shaping of the new nonstatutory action to future cases. The question in this case is whether the widow of a longshoreman may maintain such an action for the wrongful death of her husband—alleged to have resulted from injuries suffered by him while aboard a vessel in navigable waters—after the decedent recovered damages in his lifetime for his injuries.

Respondent's husband suffered severe injuries while working as a longshoreman aboard petitioner's vessel, the S. S. *Claiborne,* in Louisiana navigable waters. He recovered $140,000 for his permanent disability, physical agony, and loss of earnings in an action based on unseaworthiness,[1] but died shortly after the action was terminated. Respondent brought this wrongful-death action in the District Court for the Eastern District of Louisiana for damages suffered by her. Based on her husband's recovery, the District Court dismissed the widow's suit on grounds of *res judicata* and failure to state a claim. The Court of Appeals for the Fifth Circuit reversed, holding that *Moragne* gave "Mrs. Gaudet . . . a compen-

---

[1] The jury reduced a verdict of $175,000 by 20% because of decedent's contributory negligence.

sable cause of action for Mr. Gaudet's death wholly apart from and not extinguished by the latter's recovery for his personal injuries . . . ." 463 F. 2d 1331, 1332 (1972). We granted certiorari, 411 U. S. 963 (1973), and now affirm.

I

The harshness of the *Harrisburg* rule that in the absence of a statute, there is no maritime action for wrongful death, was only partially relieved by enactment of federal and state wrongful-death statutes.[2]   The Death

---

[2] Wrongful-death statutes are to be distinguished from survival statutes. The latter have been separately enacted to abrogate the common-law rule that an action for tort abated at the death of either the injured person or the tortfeasor. Survival statutes permit the deceased's estate to prosecute any claims for personal injury the *deceased* would have had, but for his death. They do not permit recovery for harms suffered by the deceased's family as a result of his death. See *Michigan C. R. Co.* v. *Vreeland,* 227 U. S. 59 (1913); Schumacher, Rights of Action Under Death and Survival Statutes, 23 Mich. L. Rev. 114 (1924) (hereafter Schumacher); Winfield, Death as Affecting Liability in Tort, 29 Col. L. Rev. 239 (1929); Livingston, Survival of Tort Actions, A Proposal for California Legislation, 37 Calif. L. Rev. 63 (1949); New York Law Revision Commission Report 157 *et seq.* (1935). The underlying reasons for survival statutes have been summarized by Professor Harper:

"At early common law, the personal representative could not be sued for a tort committed by the decedent during his lifetime. From early notions of the untransmittability of blame—and the quasi-criminal nature of early tort law must not be forgotten—to the crystallization of the maxim actio personalis moritur cum persona, the common law was developed without exception, and the rule was uniform that tort actions died with the parties, either wrongdoer or injured party. There was, then, no survival of a right of action either in favor of or against an executor or administrator until statutes modified somewhat the rule of dependability upon the lives of the original parties to the wrong." F. Harper, Law of Torts 673–674 (1933), quoted in 2 F. Harper & F. James, Law of Torts § 24.1 n. 2 (1956) (hereafter Harper & James). Survival statutes, in one form or another, have been enacted in over one-half the States and

on the High Seas Act, 41 Stat. 537, 46 U. S. C. §§ 761–768, created a wrongful-death action for death outside the three-mile limit.[3]  The Jones Act, 41 Stat. 1007, 46 U. S. C. § 688, incorporating the Federal Employers' Liability Act, 35 Stat. 65, 45 U. S. C. §§ 51–60, established such an action based on negligence for the wrongful death of a seaman regardless of the situs of the wrong; but otherwise, wrongful-death actions for deaths occurring on navigable waters within the three-mile territorial waters of a State depended upon whether the State had enacted a wrongful-death statute and, if so, whether the statute permitted recovery.[4]

*Moragne* reflected dissatisfaction with this state of the law that illogically and unjustifiably deprived the dependents of many maritime death victims of an adequate remedy for their losses.  Three clearly unjust consequences were of particular concern:

> "The first of these is simply the discrepancy produced whenever the rule of *The Harrisburg* holds sway:  within territorial waters, identical conduct violating federal law (here the furnishing of an unseaworthy vessel) produces liability if the victim is merely injured, but frequently not if he is killed. . . .
>
> "The second incongruity is that identical breaches of the duty to provide a seaworthy ship, resulting in death, produce liability outside the three-mile

supplement the state wrongful-death statutes, see W. Prosser, The Law of Torts § 126, p. 900 (4th ed. 1971) (hereafter Prosser), though in a small number of States the survival statute provides the only death remedy available, see 2 Harper & James § 24.2, p. 1288.  The Federal Employers' Liability Act, 45 U. S. C. § 59, and the Jones Act, 46 U. S. C. § 688, but not the Death on the High Seas Act, 46 U. S. C. §§ 761–768, contain survival provisions.

[3] *Kernan* v. *American Dredging Co.,* 355 U. S. 426, 430 n. 4 (1958).

[4] *The Tungus* v. *Skovgaard,* 358 U. S. 588 (1959).

limit—since a claim under the Death on the High Seas Act may be founded on unseaworthiness, see *Kernan* v. *American Dredging Co.,* 355 U. S. 426, 430 n. 4 (1958)—but not within the territorial waters of a State whose local statute excludes unseaworthiness claims. . . .

"The third, and assertedly the 'strangest' anomaly is that a true seaman—that is, a member of a ship's company, covered by the Jones Act—is provided no remedy for death caused by unseaworthiness within territorial waters, while a longshoreman, to whom the duty of seaworthiness was extended only because he performs work traditionally done by seamen, does have such a remedy when allowed by a state statute (footnote omitted)." 398 U. S., at 395–396.

In overruling *The Harrisburg, Moragne* ended these anomalies by the creation of a uniform federal cause of action for maritime death, designed to extend to the dependents of maritime wrongful-death victims admiralty's "special solicitude for the welfare of those men who under[take] to venture upon hazardous and unpredictable sea voyages." *Id.,* at 387. Our approach to the resolution of the issue before us must necessarily be consistent with the extension of this "special solicitude" to the dependents of the seafaring decedent.

Petitioner, Sea-Land Services, Inc. (Sea-Land), would attach no significance to this extension in shaping the maritime wrongful-death remedy. It argues that the wrongful-death remedy should recognize no loss independent of the decedent's claim for his personal injuries, and therefore that respondent had a wrongful-death remedy only "in the event Gaudet failed to prosecute [his own claim] during his lifetime." Brief for Petitioner 6. But *Moragne* had already implicitly rejected that argu-

ment; for we there recognized that a single tortious act might result in two distinct, though related harms, giving rise to two separate causes of action: "in the case of mere injury, the person physically harmed is made whole for his harm, while in the case of death, those closest to him—usually spouse and children—seek to recover for their total loss of one on whom they depended." *Id.*, at 382. Thus, *Moragne* created a true wrongful-death remedy—founded upon the death itself and independent of any action the decedent may have had for his own personal injuries.[5] Because the respondent's suit involves a different cause of action, it is not precluded by *res judicata*. For *res judicata* operates only to bar

> "repetitious suits involving the same cause of action. [The bar] rests upon considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations. The rule provides that when a court of competent jurisdiction

---

[5] Most wrongful-death statutes have also been construed to create an independent cause of action in favor of the decedent's dependents, see F. Tiffany, Death by Wrongful Act § 23 (2d ed. 1913) (hereafter Tiffany); 2 Harper & James § 24.2; Schumacher 121. Thus, for example, Coleridge, J., said of England's Lord Campbell's Act, "[I]t will be evident that this Act does not transfer this right of action to [the decedent's] representative, but gives to the representative a totally new right of action, on different principles," *Blake* v. *Midland R. Co.*, 18 Q. B. (Ad. & E., N. S.) *93, *110, 118 Eng. Rep. 35, 41 (1852). See also *Seward* v. *The Vera Cruz*, 10 App. Cas. 59, 70 (Lord Blackburn). Interpreting the wrongful-death provisions of the Federal Employers' Liability Act, 45 U. S. C. §§ 51–60, this Court described the action as "independent of any cause of action which the decedent had, and includes no damages which he might have recovered for his injury if he had survived. It is one beyond that which the decedent had,—one proceeding upon altogether different principles. It is a liability for the loss and damage sustained by relatives dependent upon the decedent," *Michigan C. R. Co.* v. *Vreeland*, 227 U. S., at 68.

has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound 'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.' *Cromwell* v. *County of Sac,* 94 U. S. 351, 352. The judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever, absent fraud or some other factor invalidating the judgment. See Von Moschzisker, 'Res Judicata,' 38 Yale L. J. 299; Restatement of the Law of Judgments, §§ 47, 48." *Commissioner* v. *Sunnen,* 333 U. S. 591, 597 (1948).

To be sure, a majority of courts interpreting state and federal wrongful-death statutes have held that an action for wrongful death is barred by the decedent's recovery for injuries during his lifetime. But the bar does not appear to rest in those cases so much upon principles of *res judicata* or public policy as upon statutory limitations on the wrongful-death action. As one authority has noted, "[t]he fact that all civil remedies for wrongful death derive from statute has important consequences. Since the right was unknown to common law, the legislatures which created the right were free to impose restrictions upon it." 2 Harper & James § 24.1, p. 1285. Thus, England's Lord Campbell's Act,[6] the first wrongful-death statute, permits recovery "whensoever the Death of a

---

[6] Lord Campbell's Act, 9 & 10 Vict., c. 93, An Act for compensating the Families of Persons killed by Accidents (Aug. 26, 1846):

"Whereas no Action at Law is now maintainable against a Person who by his wrongful Act, Neglect, or Default may have caused the Death of another Person . . . : Be it therefore enacted . . . That whensoever the Death of a Person shall be caused by wrongful Act,

Person shall be caused by [the] wrongful Act . . . [of another] and the Act . . . is such as would (if Death had not ensued) have entitled the Party injured to maintain an Action and recover Damages in respect thereof . . . ." Early English cases interpreting the Act held that this language conditioned wrongful-death recovery upon the existence of an actionable cause of the decedent at his death; [7] if the deceased had reduced his claim to judgment

---

Neglect, or Default, and the Act, Neglect, or Default is such as would (if Death had not ensued) have entitled the Party injured to maintain an Action and recover damages in respect thereof, then and in every such Case the Person who would have been liable if Death had not ensued shall be liable to an Action for Damages, notwithstanding the Death of the Person injured, and although the Death shall have been caused under such Circumstances as amount in Law to Felony.

"II. And be it enacted, That every such Action shall be for the Benefit of the Wife, Husband, Parent, and Child of the Person whose Death shall have been so caused, and shall be brought by and in the Name of the Executor or Administrator of the Person deceased; and in every such Action the Jury may give such Damages as they may think proportioned to the Injury resulting from such Death to the Parties respectively for whom and for whose Benefit the Action shall be brought . . . .

"III. Provided always, and be it enacted, That not more than One Action shall lie for and in respect of the same Subject Matter of Complaint . . . ."

[7] See, e. g., Read v. Great Eastern R. Co., L. R. 3 Q. B. 555, 558, in which the court held:

"The question turns upon the construction of s. 1 of 9 & 10 Vict. (Lord Campbell's Act), c. 93. Before that statute the person who received a personal injury, and survived its consequences, could bring an action, and recover damages for the injury; but if he died from its effects, then no action could be brought. To meet this state of the law the 9 & 10 Vict. c. 93, was passed, and 'whenever the death of a person is caused by a wrongful act, and the act is such as would, if death had not ensued, have entitled the party injured to maintain an action, and recover damages in respect thereof, then . . . the person who would have been liable if death had not ensued shall be liable for an action for damages notwithstanding the death of the

and settled with or released his tortfeasor, and therefore up to the time he died could not have maintained a further action for his injuries, his dependents could have no cause of action for his wrongful death. Since Lord Campbell's Act became the prototype of American wrongful-death statutes, most state statutes contained nearly identical language and have been similarly interpreted by state courts.[8] Though the federal wrongful-death statutes do

party injured.' Here, taking the plea to be true, the party injured could not 'maintain an action in respect thereof,' because he had already received satisfaction."

[8] See, e. g., Legg v. Britton, 64 Vt. 652, 24 A. 1016 (1892); Melitch v. United R. & E. Co., 121 Md. 457, 88 A. 229 (1913). This interpretation has been by no means universal. A number of courts interpreting Lord Campbell's Act-type state wrongful-death statutes have held that a wrongful-death action could be prosecuted even though before his death the decedent could not have brought a cause of action for his personal injuries because he had already recovered a judgment, settled, or released his claims. A classic statement of this view is that of the South Dakota Supreme Court in Rowe v. Richards, 35 S. D. 201, 215–216, 151 N. W. 1001, 1006 (1915):

"We must confess our inability to grasp the logic of any course of so-called reasoning through which the conclusion is drawn that the husband simply because he may live to suffer from a physical injury and thus become vested with a cause of action for the violation of his own personal right, has an implied power to release a cause of action—one which has not then accrued; one which may never accrue; and one which from its very nature cannot accrue until his death; and one which, if it ever does accrue, will accrue in favor of his wife and be based solely upon a violation of a right vested solely in the wife."

The contrary interpretation of the pertinent statutory language has also been the subject of scholarly criticism. Professor Prosser argues: "It is not at all clear, however, that such provisions of the death acts ever were intended to prevent recovery where the deceased once had a cause of action, but it has terminated before his death. The more reasonable interpretation would seem to be that they are directed at the necessity of some original tort on the part of the defendant, under circumstances giving rise to liability in the

not contain the same controversial language, the FELA, at least, has been held to be "essentially identical with" Lord Campbell's Act, *Michigan C. R. Co.* v. *Vreeland,* 227 U. S. 59, 69 (1913), and therefore similar restrictions have been placed on FELA wrongful-death recovery. *Mellon* v. *Goodyear,* 277 U. S. 335, 345 (1928).[9]

first instance, rather than to subsequent changes in the situation affecting only the interest of the decedent." Prosser § 127, p. 911. See also Schumacher 120–121; Fleming, The Lost Years: A Problem in the Computation and Distribution of Damages, 50 Calif. L. Rev. 598, 608–610 (1962); Anno., 70 Am. St. Rep. 666, 684 (1898). In States where the limiting language of Lord Campbell's Act is absent from the wrongful-death statute, the courts have permitted wrongful-death actions although the decedent had already recovered for his own injuries, see, *e. g., Blackwell* v. *American Film Co.,* 189 Cal. 689, 693–694, 209 P. 999, 1001 (1922).

[9] Beyond the common elements that the FELA may share with Lord Campbell's Act, express statutory terms peculiar to the FELA lend additional support for the result reached in *Mellon* v. *Goodyear.* The Act provides:

"Every common carrier by railroad while engaging in commerce . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, *or,* in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence . . . of such carrier, or by reason of any defect or insufficiency, due to its negligence . . . ." 45 U. S. C. § 51 (emphasis added).

The significant language, of course, is the use of the disjunctive "or." This language was understood by the Court of Appeals for the Fifth Circuit in *Seaboard Air Line R. Co.* v. *Oliver,* 261 F. 1, 2 (1919): "The two distinct rights of action are given in the alternative or disjunctively. The language used indicates the absence of an intention to allow recoveries for the same wrong by both the injured employé and, in case of his death, by his personal representative; only one

*Moragne,* on the other hand, requires that the shape of the new maritime wrongful-death remedy (not a statutory creation but judge-made, see *The Tungus* v. *Skovgaard,* 358 U. S. 588, 611 (1959) (opinion of BRENNAN, J.)) be guided by the principle of maritime law that "certainly it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rules," *The Sea Gull,* 21 F. Cas. 909 (No. 12,578) (C. C. Md. 1865), quoted in *Moragne,* 398 U. S., at 387. Since the policy underlying the remedy is to insure compensation of the dependents for *their* losses resulting from the decedent's death, the remedy should not be precluded merely because the decedent, during his lifetime, is able to obtain a judgment for his own personal injuries. No statutory language or "established and inflexible rules" of maritime law require a contrary conclusion.[10]

## II

Sea-Land argues that, if dependents are not prevented from bringing a separate cause of action for wrongful death in cases where the decedent has already received a judgment for his personal injuries, then necessarily it

recovery being allowed when the injured employé dies without having enforced the right of action given to him. It seems to be a fair inference from that language that the right of action given to the injured employé's personal representative was intended to be unenforceable after the enforcement and satisfaction of the one given to the employé himself."

[10] Significantly, the Death on the High Seas Act, 46 U. S. C. §§ 761–768, the only federal statute "that deals specifically and exclusively with actions for wrongful death . . . for breaches of the duties imposed by general maritime law," *Moragne* v. *States Marine Lines,* 398 U. S. 375, 407 (1970), has not been interpreted, as the FELA has been, to bar wrongful-death recovery in cases where the decedent has already recovered during his lifetime for his personal injuries.

will be subject to double liability. In order to evaluate this argument it is necessary first to identify the particular harms suffered by the dependents, for which the maritime wrongful-death remedy permits recovery of damages. In identifying these compensable harms, we are not without useful guides; for in *Moragne* we recognized that with respect to "particular questions of the measure of damages, the courts will not be without persuasive analogy for guidance. Both the Death on the High Seas Act and the numerous state wrongful-death acts have been implemented with success for decades. The experience thus built up counsels that a suit for wrongful death raises no problems unlike those that have long been grist for the judicial mill." 398 U. S., at 408. Our review of those authorities, and the policies of maritime law, persuade us that, under the maritime wrongful-death remedy, the decedent's dependents may recover damages for their loss of support, services, and society, as well as funeral expenses.

Recovery for loss of support has been universally recognized,[11] and includes all the financial contributions

---

[11] See, *e. g., Michigan C. R. Co.* v. *Vreeland,* 227 U. S., at 70; *The S. S. Black Gull,* 90 F. 2d 619 (CA2 1937) (interpreting the Death on the High Seas Act); *Dugas* v. *National Aircraft Corp.,* 438 F. 2d 1386 (CA3 1971) (interpreting the Death on the High Seas Act); Tiffany §§ 153, 160; S. Speiser, Recovery for Wrongful Death § 3.4 (1966) (hereafter Speiser); Prosser § 127, p. 906. Damages for loss of support have also been awarded consistently in post-*Moragne* maritime wrongful-death actions. See, *e. g., Dennis* v. *Central Gulf S. S. Corp.,* 323 F. Supp. 943 (ED La. 1971), aff'd, 453 F. 2d 137 (CA5 1972); *Petition of United States Steel Corp.,* 436 F. 2d 1256 (CA6 1970); *In re Cambria S. S. Co.,* 353 F. Supp. 691 (ND Ohio 1973); *Mascuilli* v. *United States,* 343 F. Supp. 439 (ED Pa. 1972); *In re Sincere Navigation Corp.,* 329 F. Supp. 652 (ED La. 1971); *Petition of Canal Barge Co.,* 323 F. Supp. 805 (ND Miss. 1971).

that the decedent would have made to his dependents had he lived. Similarly, the overwhelming majority of state wrongful-death acts[12] and courts interpreting the Death on the High Seas Act[13] have permitted recovery for the monetary value of services the decedent provided and would have continued to provide but for his wrongful death.[14] Such services include, for example, the nurture, training, education, and guidance that a child would have received had not the parent been wrongfully killed.[15] Services the decedent performed at home or for his spouse are also compensable.[16]

Compensation for loss of society, however, presents a closer question. The term "society" embraces a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection.[17] Unquestionably, the deprivation of these

---

[12] Tiffany §§ 158–164; Speiser §§ 3.36, 3.40.

[13] *Moore-McCormack Lines, Inc.* v. *Richardson,* 295 F. 2d 583 (CA2 1961); *Dugas* v. *National Aircraft Corp., supra; Carli* v. *New London Flying Service, Inc.,* 1965 AMC 1644 (DC Conn. 1962).

[14] Such damages have also been recovered in post-*Moragne* maritime wrongful-death actions. See, *e. g., Dennis* v. *Central Gulf S. S. Corp., supra; Petition of United States Steel Corp., supra; In re Cambria S. S. Co., supra; Mascuilli* v. *United States, supra; In re Sincere Navigation Corp., supra; Petition of Canal Barge Co., supra.*

[15] See, *e. g., Michigan C. R. Co.* v. *Vreeland, supra,* at 71; *Moore-McCormack Lines, Inc.* v. *Richardson, supra; Gaydos* v. *Domabyl,* 301 Pa. 523, 152 A. 549 (1930).

[16] See, *e. g., Michigan C. R. Co.* v. *Vreeland, supra,* at 71, 74; *Carli* v. *New London Flying Service, Inc., supra; Alden* v. *Norwood Arena, Inc.,* 332 Mass. 267, 124 N. E. 2d 505 (1955); *Kroeger* v. *Safranek,* 165 Neb. 636, 87 N. W. 2d 221 (1957).

[17] Loss of society must not be confused with mental anguish or grief, which is not compensable under the maritime wrongful-death remedy. The former entails the loss of positive benefits, while the

benefits by wrongful death is a grave loss to the decedent's dependents. Despite this fact, a number of early wrongful-death statutes were interpreted by courts to preclude recovery for these losses on the ground that the statutes were intended to provide compensation only for "pecuniary loss," and that the loss of society is not such an economic loss.[18]  Other wrongful-death statutes contain express language limiting recovery to pecuniary losses;[19] for example, the Death on the High

latter represents an emotional response to the wrongful death.  The difference between the two is well expressed as follows:

"When we speak of recovery for the beneficiaries' mental anguish, we are primarily concerned, not with the benefits they have lost, but with the issue of compensating them for their harrowing experience resulting from the death of a loved one.  This requires a somewhat negative approach.  The fundamental question in this area of damages is what deleterious effect has the death, as such, had upon the claimants?  In other areas of damage, we focus on more positive aspects of the injury such as what would the decedent, had he lived, have *contributed* in terms of support, assistance, training, comfort, consortium, etc. . . .

.   .   .   .   .

"The great majority of jurisdictions, including several which do allow damages for other types of nonpecuniary loss, hold that the grief, bereavement, anxiety, distress, or mental pain and suffering of the beneficiaries may not be regarded as elements of damage in a wrongful death action."  Speiser § 3.45, p. 223 (emphasis in original) (footnotes omitted).

[18] Lord Campbell's Act, which, by its terms, allows the jury to award "such damages as they may think proportional to the injury," was interpreted to permit recovery only for "pecuniary losses," *Blake* v. *Midland R. Co.*, 18 Q. B. (Ad. & E., N. S.) *93, 118 Eng. Rep. 35 (1852).  Most American courts, interpreting similar wrongful-death statutes, followed suit, see, *e. g.*, *Michigan C. R. Co.* v. *Vreeland, supra,* at 70.  See also Speiser § 3.1.

[19] A list of the States that have such statutes and reprints of the individual statutes may be found in Speiser § 3.1, p. 58 n. 5, and Appendix.

Seas Act limits recovery to "a fair and just compensation for the *pecuniary* loss sustained by the persons for whose benefit the suit is brought . . . ," 46 U. S. C. § 762 (emphasis added), and consequently has been construed to exclude recovery for the loss of society.[20]

A clear majority of States, on the other hand, have rejected such a narrow view of damages, and, either by express statutory provision or by judicial construction, permit recovery for loss of society.[21] This expansion of damages recoverable under wrongful-death statutes to include loss of society has led one commentator to observe that "[w]hether such damages are classified as 'pecuniary,' or recognized and allowed as nonpecuniary, the recent trend is unmistakably in favor of permitting such recovery." Speiser 218. Thus, our decision to permit recovery for loss of society aligns the

---

[20] See, *e. g., Middleton* v. *Luckenbach S. S. Co., Inc.,* 70 F. 2d 326 (CA2 1934); *First Nat. Bank in Greenwich* v. *National Airlines, Inc.,* 288 F. 2d 621 (CA2 1961).

[21] The various state and federal wrongful-death statutes have been closely canvassed and catalogued in Speiser (Supp. 1972) and Comment, Wrongful Death Damages in North Carolina, 44 N. C. L. Rev. 402 (1966). Those sources indicate that 27 of the 44 state and territorial wrongful-death statutes which measure damages by the loss sustained by the beneficiaries, permit recovery for loss of society. Alaska, Arkansas, Florida, Hawaii, Kansas, Mississippi, Nevada, West Virginia, Wisconsin, and Wyoming have statutes expressly providing for such damages. Arizona, Idaho, Louisiana, New Mexico, Puerto Rico, South Carolina, Utah, Virginia, and Washington have equivocal statutory language that has been judicially interpreted to include recovery for loss of society. Finally, the wrongful-death statutes of California, Delaware, Michigan, Minnesota, Montana, Pennsylvania, Texas, and the Virgin Islands, which either expressly or by judicial construction limit recovery to pecuniary losses, have been judicially interpreted, nevertheless, to permit recovery for the pecuniary value of the decedent's society.

maritime wrongful-death remedy with a majority of state wrongful-death statutes.[22]  But in any event, our decision is compelled if we are to shape the remedy to comport with the humanitarian policy of the maritime law to show "special solicitude" for those who are injured within its jurisdiction.[23]

Objection to permitting recovery for loss of society often centers upon the fear that such damages are somewhat speculative and that factfinders will return

---

[22] We recognize, of course, that our decision permits recovery of damages not generally available under the Death on the High Seas Act.  Traditionally, however, "Congress has largely left to this Court the responsibility for fashioning the controlling rules of admiralty law," *Fitzgerald* v. *United States Lines Co.*, 374 U. S. 16, 20 (1963). The scope and content of the general maritime remedy for wrongful death established in *Moragne* is no exception.  After combing the legislative history of the Death on the High Seas Act, we concluded in *Moragne* that Congress expressed "no intention . . . of foreclosing any nonstatutory federal remedies that might be found appropriate to effectuate the policies of general maritime law."  398 U. S., at 400.  Nothing in the legislative history of the Act suggests that Congress intended the Act's statutory measure of damages to pre-empt any additional elements of damage for a maritime wrongful-death remedy which this Court might deem "appropriate to effectuate the policies of general maritime law."  To the contrary, Congress' insistence that the Act not extend to territorial waters, see S. Rep. No. 216, 66th Cong., 1st Sess., 3 (1919); H. R. Rep. No. 674, 66th Cong., 2d Sess., 3 (1920); 59 Cong. Rec. 4482–4486 (1920), indicates that Congress was not concerned that there be a uniform measure of damages for wrongful deaths occurring within admiralty's jurisdiction, for in many instances state wrongful-death statutes extending to territorial waters provided a more liberal measure of damages than the Death on the High Seas Act.  See *Greene* v. *Vantage S. S. Corp.*, 466 F. 2d 159 (CA4 1972).

[23] Insofar as *Simpson* v. *Knutsen,* 444 F. 2d 523 (CA9 1971), and *Petition of United States Steel Corp.*, 436 F. 2d 1256 (CA6 1970), are inconsistent with our holding, we disagree.

excessive verdicts.[24]   We were not unaware of this objection in *Moragne,* where we said:

> "[O]ther courts have recognized that calculation of the loss sustained by dependents or by the estate of the deceased, which is required under most present wrongful-death statutes . . . does not present difficulties more insurmountable than assessment of damages for many nonfatal personal injuries." 398 U. S., at 385.

For example, juries are often called upon to measure damages for pain and suffering, mental anguish in disfigurement cases, or intentional infliction of emotional harm.   In fact, since the 17th century, juries have assessed damages for loss of consortium—which encompasses loss of society—in civil actions brought by husbands whose wives have been negligently injured.[25]

---

[24] Of course, the maritime wrongful-death remedy is an admiralty action ordinarily tried to the court and not a jury.   There are instances, however, where the admiralty action may be joined with a civil claim, for example, a claim based upon the Jones Act, see *Moragne,* 398 U. S., at 396 n. 12; *Peace* v. *Fidalgo Island Packing Co.,* 419 F. 2d 371 (CA9 1969), or a state survival statute, see *Dugas* v. *National Aircraft Corp.,* 438 F. 2d 1386 (CA3 1971); *Petition of Gulf Oil Corp.,* 172 F. Supp. 911 (SDNY 1959); cf. *Kernan* v. *American Dredging Co.,* 355 U. S. 426, 430 n. 4 (1958), and a jury trial may be requested.

[25] See, *e. g., Young* v. *Pridd,* 3 Cro. Car. 89, 79 Eng. Rep. 679 (Ex. Ch. 1627); *Hyde* v. *Scyssor,* 2 Cro. Jac. 538, 79 Eng. Rep. 462 (K. B. 1619); *Mowry* v. *Chaney,* 43 Iowa 609 (1876); *Guevin* v. *Manchester St. R.,* 78 N. H. 289, 99 A. 298 (1916); Holbrook, The Change in the Meaning of Consortium, 22 Mich. L. Rev. 1 (1923); Lippman, The Breakdown of Consortium, 30 Col. L. Rev. 651 (1930); Note, Judicial Treatment of Negligent Invasion of Consortium, 61 Col. L. Rev. 1341 (1961).   Damages for loss of consortium have been awarded by courts of admiralty as well.   See *N. Y. & Long Branch Steamboat Co.* v. *Johnson,* 195 F. 740 (CA3 1912); 1 E. Benedict, Admiralty 366 (6th ed. 1940) ("When a

590

More recently, juries have been asked to measure loss of consortium suffered by wives whose husbands have been negligently harmed.[26]   Relying on this history, the Florida Supreme Court recognized as early as 1899 that the damages for loss of society recovered by a wife for the wrongful death of her husband were "no more fanciful or speculative than the frugality, industry, usefulness, attention and tender solicitude of a wife [all of which a husband might recover at common law in an action for consortium], and the one can be compensated [as easily] by that simple standard of pecuniary loss . . . as the other." *Florida C. & P. R. Co.* v. *Foxworth,* 41 Fla. 1, 73, 25 So. 338, 348.

We are confident that the measure of damages for loss of society in a maritime wrongful-death action can "be left to turn mainly upon the good sense and deliberate judgment of the tribunal assigned by law to ascertain what is a just compensation for the injuries inflicted." *The City of Panama,* 101 U. S. 453, 464 (1880).   As in all damages awards for tortious injury, "[i]nsistence on mathematical precision would be illusory and the judge or juror must be allowed a fair latitude to make reasonable approximations guided by judgment and practical experience," *Whitaker* v. *Blidberg Rothchild Co.,* 296 F. 2d 554, 555 (CA4 1961).   Moreover, appellate tribunals have amply demonstrated their ability to control excessive awards, see, *e. g., Moore-McCormack Lines, Inc.* v. *Richardson,* 295 F. 2d 583 (CA2 1961); *Dugas* v. *National Aircraft Corp.,* 438 F. 2d 1386 (CA3 1971).

---

personal injury to a wife is maritime by locality, her husband may recover his damages for loss of her services, loss of consortium, etc., in admiralty").   But see *Igneri* v. *Cie. de Transports Oceaniques,* 323 F. 2d 257 (CA2 1963).

[26] See, *e. g., Hitaffer* v. *Argonne Co.,* 87 U. S. App. D. C. 57, 183 F. 2d 811 (1950); Prosser § 125, p. 895; Note, Judicial Treatment of Negligent Invasion of Consortium, 61 Col. L. Rev. 1341 (1961).

Finally, in addition to recovery for loss of support, services, and society, damages for funeral expenses may be awarded under the maritime wrongful-death remedy in circumstances where the decedent's dependents have either paid for the funeral or are liable for its payment. A majority of States provided for such recovery under their wrongful-death statutes.[27]  Furthermore, although there is a conflict over whether funeral expenses are compensable under the Death on the High Seas Act, compare *The Culberson,* 61 F. 2d 194 (CA3 1932), with *Moore* v. *The ·O S Fram,* 226 F. Supp. 816 (SD Tex. 1963), aff'd, *sub nom. Wilhelm Seafoods, Inc.* v. *Moore,* 328 F. 2d 868 (CA5 1964), it is clear that funeral expenses were permitted under the general maritime law prior to *The Harrisburg,* see, *e. g., Hollyday* v. *The David Reeves,* 12 F. Cas. 386 (No. 6,625) (Md. 1879).  We therefore find no persuasive reason for not following the earlier admiralty rule and thus hold that funeral expenses are compensable.[28]

Turning now to Sea-Land's double-liability argument, we note that, in contrast to the elements of damages which we today hold may be recovered in a maritime wrongful-death action, the decedent recovered damages only for his loss of past and future wages, pain and suffering, and medical and incidental expenses.  Obviously, the decedent's recovery did not include damages for the dependents' loss of services or of society, and funeral expenses.  Indeed, these losses—unique to the decedent's

---

[27] See Speiser § 3.49;  Comment, Wrongful Death Damages in North Carolina, 44 N. C. L. Rev. 402, 419–420 (1966).

[28] Funeral expenses have been awarded in post-*Moragne* wrongful-death actions. See, *e. g., Greene* v. *Vantage S. S. Corp.,* 466 F. 2d 159 (CA4 1972); *Dennis* v. *Central Gulf S. S. Corp.,* 323 F. Supp. 943 (ED La. 1971), aff'd, 453 F. 2d 137 (CA5 1972); *Mascuilli* v. *United States,* 343 F. Supp. 439 (ED Pa. 1972); *In re Sincere Navigation Corp.,* 329 F. Supp. 652 (ED La. 1971).

dependents—could not accrue until the decedent's death. Thus, recovery of damages for these losses in the maritime wrongful-death action will not subject Sea-Land to double liability or provide the dependents with a windfall.

There is, however, an apparent overlap between the decedent's recovery for loss of future wages and the dependents' subsequent claim for support.[29] In most instances, the dependents' support will derive, at least in part, from the decedent's wages. But, when a tortfeasor has already fully compensated the decedent, during his lifetime, for his loss of future wages, the tortfeasor should not be required to make further compensation in a subsequent wrongful-death suit for any portion of previously paid wages. Any potential for such double liability can be eliminated by the application of familiar principles of collateral estoppel to preclude a decedent's dependents from attempting to relitigate the issue of the support due from the decedent's future wages.[30]

---

[29] The Court of Appeals below recognized the potential problem of double recovery and committed "to the discretion of the trial court the task of making an appropriate deduction from or accommodation of any judgment to which Mrs. Gaudet might otherwise be entitled, to insure that no double recovery results. *Cf.* Billiot v. Sewart, 382 F. 2d 662 (5th Cir. 1967); Prosser, [Law of Torts,] at 934–935," 463 F. 2d, at 1333 n. 1. In our view, application of collateral estoppel principles makes resort to theories of setoff or recoupment generally unnecessary.

[30] If the dependents' total support received from the decedent exceeds the future wages paid to the decedent by the tortfeasor, the dependents will have an actionable cause for support against the tortfeasor for the difference. In that circumstance, if a special verdict was not rendered in the decedent's action specifying the amount of damages awarded for future wages, it may become necessary in the dependents' action to determine what portion of the decedent's lump-sum recovery for his injuries was attributable to future wages. This in no way conflicts with our holding that the dependents will be estopped from relitigating the amount of future

Collateral estoppel applies

"where the second action between the same parties is upon a different cause or demand . . . . In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but 'only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.' Cromwell v. County of Sac, [94 U. S. 351,] 353. And see Russell v. Place, 94 U. S. 606; Southern Pacific R. Co. v. United States, 168 U. S. 1, 48; Mercoid Corp. v. Mid-Continent Co., 320 U. S. 661, 671. Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time. But matters which were actually litigated and determined in the first proceeding cannot later be relitigated." Commissioner v. Sunnen, 333 U. S., at 597–598.

And while the general rule is that nonparties to the first action are not bound by a judgment or resulting determination of issues, see Blonder-Tongue v. University Foundation, 402 U. S. 313, 320–327 (1971), several exceptions exist. The pertinent exception here is that nonparties may be collaterally estopped from relitigating issues necessarily decided in a suit brought by a party who acts as a fiduciary representative for the beneficial interest of the nonparties.[31] In such cases, "the bene-

wages; it is merely an acknowledgment that the amount of the wage recovery in the first action may have to be clarified in the second.

[31] See Vestal, Preclusion/Res Judicata Variables: Parties, 50 Iowa L. Rev. 27, 63–64 (1964); Note, Developments in the Law—

ficiaries are bound by the judgment with respect to the interest which was the subject of the fiduciary relationship; they are . . . bound by the rules of collateral estoppel in suits upon different causes of action," F. James, Civil Procedure § 11.28, p. 592 (1965).

Under the prevailing American rule, a tort victim suing for damages for permanent injuries is permitted to base his recovery "on his prospective earnings for the balance of his life expectancy at the time of his injury *undiminished by any shortening of that expectancy as a result of the injury,*" 2 Harper & James § 24.6, pp. 1293–1294 (emphasis in original).[32] Thus, when a decedent brings his own personal-injury action during his lifetime and recovers damages for his lost wages he acts in a fiduciary capacity to the extent that he represents his dependents' interest in that portion of his prospective earnings which, but for his wrongful death, they had a reasonable expectation of his providing for their support. Since the decedent's recovery of any future wages will normally be dependent upon his fully litigating that issue, we need not fear that applying principles of collateral estoppel to pre-

Res Judicata, 65 Harv. L. Rev. 818, 855–856 (1952); Restatement of Judgments § 92 (1942) deals expressly with wrongful-death actions and provides that, even in cases where the wrongful-death action is not premised upon the decedent's having an extant cause of action for personal injuries at the time of his death, "the rules of res judicata apply in actions brought after his death as to issues litigated in an action brought by him and terminating in a judgment before his death," *id.*, comment on subsection (1).

[32] This rule appears to have been rejected in England in favor of compensating a personal-injury victim on the basis of his life expectancy *after* the accident. See *Oliver* v. *Ashman*, [1961] 3 W. L. R. 669 (C. A.); Fleming, The Lost Years: A Problem in the Computation and Distribution of Damages, 50 Calif. L. Rev. 598, 600 (1962). Under the English rule, the accident victim is not permitted to recover lost wages for the difference in years between his pre-accident and post-accident life expectancy.

clude the decedent's dependents' claim for a portion of those future wages will deprive the dependents of their day in court.

The judgment of the Court of Appeals is

*Affirmed.*

Mr. Justice Powell, with whom The Chief Justice, Mr. Justice Stewart, and Mr. Justice Rehnquist join, dissenting.

The Court today rewrites several areas of the admiralty law of wrongful death. In holding that a wrongful-death action may be brought although the decedent has previously recovered in his own suit based on the same wrongful act, the Court disregards a major body of maritime and state law. The majority opinion also opens up an area of sentimental damages that has not been allowed under traditional admiralty doctrine. It hopes to prevent double recovery through a novel application of collateral estoppel principles, which rests in turn on the unprecedented concept that a seriously injured person acts as a fiduciary for an undefined class of potential beneficiaries with regard to his *own* recovery in his *own* personal-injury action. Given the sweep of the majority's approach, the upshot in many areas will be a nearly total nullification of the congressional enactments previously governing maritime wrongful death. Except for a technical joinder of counts to obtain a jury trial and thus to maximize the benefits promised by the Court's opinion, no one entitled to rely on the admiralty doctrine of unseaworthiness will, after today, seek relief under the federal maritime wrongful-death statutes. Several limitations built into those congressional enactments have been swept aside by the majority's decision.

In reaching these results, the majority purports to apply *Moragne* v. *States Marine Lines,* 398 U. S.

375 (1970). It is true that *Moragne* overruled *The Harrisburg,* 119 U. S. 199 (1886), and held that an action for death caused by a violation of maritime duties would lie under the general law of admiralty. But *Moragne* does not support the Court's far-reaching holdings in this case. Indeed, *Moragne,* which was essentially a response to a gap in maritime remedies for deaths occurring in state territorial waters, explicitly counsels against the sort of *tabula rasa* restructuring of the law of admiralty undertaken by the majority. Writing for the Court, Mr. Justice Harlan stressed the need to "assure uniform vindication of federal policies . . . ." 398 U. S., at 401. He eschewed "the fashioning of a whole new body of federal law . . . ," *id.,* at 405, believing that the lower courts would have slight difficulty "in applying accepted maritime law to actions for wrongful death." *Id.,* at 406. He stated that those courts would find "persuasive analogy for guidance" in the accumulated experiences under the state wrongful-death statutes and the Death on the High Seas Act, 46 U. S. C. § 761 *et seq.,* 398 U. S., at 408. He emphasized the consistency of the Court's holding with the congressional purposes behind the Jones Act, 46 U. S. C. § 688. 398 U. S., at 400–402.

The Court has now rejected these guidelines so recently laid down in *Moragne.* Disregarding the source of law endorsed by *Moragne,* as well as the concern for uniformity expressed in that opinion, the Court has fashioned a new substantive right of recovery in conflict with "accepted maritime law" and a new body of law with regard to the elements of damages recoverable in admiralty wrongful-death actions. In my view, these unprecedented extensions of admiralty law exhibit little deference for *stare decisis* or, indeed, for enunciated congressional policy. I also believe these new doctrines are unsound as a matter of principle, will create difficulty

and confusion in the litigation of admiralty cases, and are very likely to result in duplicative recoveries.

## I

Long accepted law under the Jones Act,[1] one of the two federal maritime wrongful-death statutes,[2] does not countenance the result reached by the majority today. The Jones Act "created a federal right of action for the wrongful death of a seaman based on the statutory action under the Federal Employers' Liability Act [FELA]." *Kernan* v. *American Dredging Co.*, 355 U. S. 426, 429 (1958). Since the FELA, 45 U. S. C. §§ 51–60, is the "régime which the Jones Act made applicable to seamen . . . ,"[3] the "entire judicially developed doctrine of liability" under the FELA governs a Jones Act case.

---

[1] 46 U. S. C. § 688. The Jones Act provides:

"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located."

Since the Act employs the terms "in the course of his employment . . . ," the cause of action it provides "follows from the seaman's employment status and is not limited to injury or death occurring on the high seas." *Moragne* v. *States Marine Lines*, 398 U. S. 375, 394 (1970). Proof of negligence is a predicate to recovery. *Ibid.*

[2] The second such statute, the Death on the High Seas Act, is discussed below. See text, *infra*, at 599–601 and nn. 4–6.

[3] *Igneri* v. *Cie. de Transports Oceaniques*, 323 F. 2d 257, 266 (CA2 1963), cert. denied, 376 U. S. 949 (1964).

*Kernan, supra,* at 439. An uninterrupted line of FELA and Jones Act cases going back a half century holds that if the decedent reduces his claim to settlement or judgment prior to his death, or otherwise extinguishes his right to pursue the claim, no subsequent wrongful-death action may be brought. See, *e. g., Mellon* v. *Goodyear,* 277 U. S. 335 (1928); *Flynn* v. *New York, N. H. & H. R. Co.,* 283 U. S. 53 (1931); *Walrod* v. *Southern Pacific Co.,* 447 F. 2d 930 (CA9 1971); *Seaboard Air Line R. Co.* v. *Oliver,* 261 F. 1 (CA5 1919); *Gilmore* v. *Southern R. Co.,* 229 F. Supp. 198 (ED La. 1964); *Purvis* v. *Luckenbach S. S. Co.,* 93 F. Supp. 271 (SDNY 1949).

*Mellon* and its progeny hold unequivocally that a judgment, settlement, or similarly conclusive event with regard to the decedent's own right to seek recovery for his personal injuries "[precludes] any remedy by the personal representative based upon the same wrongful act." *Mellon, supra,* at 344. The Court in *Mellon* quoted with approval the following language from a state court opinion:

> " ' "Whether the right of action is a transmitted right or an original right, whether it be created by a survival statute or by a statute creating an independent right, the general consensus of opinion seems to be that the gist and foundation of the right in all cases is the wrongful act, and that for such wrongful act but one recovery should be had, and that if the deceased had received satisfaction in his lifetime, either by settlement and adjustment or by adjudication in the courts, no further right of action existed." ' " 277 U. S., at 345. (Citation omitted.)

The *Mellon* rule does not rest on a disagreement in principle with the majority's view, *ante,* at 577–578, that a single wrong is capable of producing separate and distinct injuries, those to the decedent and those to his bene-

ficiaries. Indeed, the Court in *Mellon* explicitly recognized that distinction. It noted that although originating in the same wrongful act, there are two separate and distinct claims, one assertable by the injured person and the other upon his death by his personal representative or dependents. 277 U. S., at 340, 342. Nevertheless, *Mellon* and uniformly consistent Jones Act and FELA cases that have followed it hold that when the decedent extinguishes his own claim he simultaneously forecloses any wrongful-death action. As Mr. Justice Holmes put it for a unanimous Court in *Flynn, supra,* the wrongful-death action is "derivative and dependent upon the continuance of a right in the injured employee at the time of his death." 283 U. S., at 56 (citation omitted). Thus, the Court's opinion in this case creates a square conflict with one of the major bodies of maritime law that *Moragne* viewed as a source of guidance.

The Court's implication that the Death on the High Seas Act [4] supports its departure from *Mellon, ante,* at 583 n. 10, is at best conjectural. In fact, no cases addressing the situation presented here appear to have arisen under that Act. Conceivably such a case could arise, because the High Seas Act by its terms covers deaths caused by injuries inflicted at sea, not simply deaths occurring on the high seas. Cf. *Lacey* v. *L. W. Wiggins Airways, Inc.,* 95 F.

---

[4] 46 U. S. C. § 761 *et seq.* The opening section of the Death on the High Seas Act, 46 U. S. C. § 761, provides:

"Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued."

Supp. 916 (Mass. 1951).[5]  Thus, it would be possible
in theory for a person injured at sea to recover for
his personal injuries and, following his death, for his
survivors to attempt to bring suit under the High Seas
Act.  But certainly the Act would not be read as allow-
ing the subsequent action.  Such a result would conflict
with the *Mellon* line of cases under the Jones Act and
the FELA, producing precisely the lack of uniformity
normally sought to be avoided in admiralty.  Moreover,
the High Seas Act contains a substitution provision,
46 U. S. C. § 765, that by implication forbids a wrongful-
death action following a decedent's judgment.  Section
765 provides that if a person who suffers injuries within
the scope of the Act dies during the pendency of his
own personal injury action, *that* action may be trans-
formed by a personal representative into a wrongful-
death action countenanced by the Act.[6]  Surely this
substitution provision evidences a congressional recog-

---

[5] But see *Pickles* v. *F. Leyland & Co.*, 10 F. 2d 371 (Mass. 1925).
*Pickles* holds that if the death occurs on land, the High Seas Act is
not applicable, even though the injuries ultimately producing death
were inflicted at sea.  *Id.*, at 372.  If this were the correct view, it
would be easy to see why cases like the instant one had not pre-
viously arisen under the High Seas Act.  The Act would simply
not allow actions like the present one.  However, the Act says
"death . . . caused by wrongful act, neglect, or default occurring
on the high seas . . . ," not "death occurring on the high seas."  See
n. 4, *supra*.  *Pickles*, therefore, is probably an erroneous reading of
the Act.

[6] Section 765 reads:

"If a person die as the result of such wrongful act, neglect, or
default as is mentioned in section 761 of this title [see n. 4, *supra*]
during the pendency in a court of admiralty of the United States of
a suit to recover damages for personal injuries in respect of such act,
neglect, or default, the personal representative of the decedent may
be substituted as a party and the suit may proceed as a suit under
this chapter for the recovery of [pecuniary losses]."

nition that only one action or the other should be allowed to proceed to judgment.

The Court's reference in *Moragne* to the "strong concern for uniformity" in admiralty law, 398 U. S., at 401, often repeated and often related to congressional policies underlying the Jones Act and the Death on the High Seas Act, *id.*, at 396 n. 12, 401–402, was not an expression of concern solely for intellectual consistency. "Such uniformity not only will further the concerns of both of the . . . Acts but also will give effect to the constitutionally based principle that federal admiralty law should be 'a system of law coextensive with, and operating uniformly in, the whole country.' *The Lottawanna,* 21 Wall. 558, 575 (1875)." 398 U. S., at 401–402. But the lack of uniformity produced by the majority's holding should be evident. For example, whether a seaman's injuries occur on land or at sea will be determinative under the majority's approach. If on land, the seaman will have the Jones Act as his admiralty-related remedy.[7] Under that Act and the *Mellon* line of cases his own personal-injury action will foreclose a subsequent wrongful-death action—a misfortune that would not have befallen him and his survivors if only he had been lucky enough to have been injured at sea. This anomaly is not something, I suspect, the Court will long abide. Since "[i]t has been consistently true in this branch of the law that whatever a seaman can get under one theory he can sooner or later get under all the others . . . ,"[8] the Court's holding undoubtedly portends an express overruling of *Mellon* and its successors, cases that the Court bypasses today.

Aside from the disunity in the law of admiralty inherent in its opinion, I fail to see how the Court can square

---

[7] See n. 1, *supra.*

[8] G. Gilmore & C. Black, The Law of Admiralty 308 (1957).

its sweeping approach with *Moragne*'s reliance on and admonition to draw by analogy from the federal statutes. *E. g.,* 398 U. S., at 400–402, 408. *Moragne* envisioned a process of accommodation with those statutes, not their abrupt and near-total forced obsolescence. In this regard, it might be noted that the Court has still not resolved many of the practical questions left open in *Moragne,* such as how to define the class of beneficiaries or an appropriate limitation period. Presumably, in resolving such questions the lower courts are to continue to rely on the admiralty wrongful-death statutes. Now they are placed in the interesting position of analogizing to statutes under which the very claim before them would be blocked.

## II

The Court in *Moragne* also counseled the lower courts to draw by analogy from the case law under the state wrongful-death statutes. *Id.,* at 408. Under the great majority of those statutes, whether of survival or true death act character, Mrs. Gaudet's cause of action would have been foreclosed ·by her husband's recovery.[9]

---

[9] *E. g., Roberts* v. *Union Carbide Corp.,* 415 F. 2d 474 (CA3 1969) (New Jersey law); *Schlavick* v. *Manhattan Brewing Co.,* 103 F. Supp. 744 (ND Ill. 1952) (Indiana law)ᾳ The cases are reviewed in W. Prosser, The Law of Torts 911–912 (4th ed. 1971) (hereafter Prosser); 2 F. Harper & F. James, The Law of Torts § 24.6 (1956 and Supp. 1968); Fleming, The Lost Years: A Problem in the Computation and Distribution of Damages, 50 Calif. L. Rev. 598, 599, 608–609 (1962) (hereafter Fleming). The latter commentator notes that "[a]t least twenty-three jurisdictions . . . have so held in the clearest terms and some half a dozen more have so indicated in dicta." *Id.,* at 608–609, n. 38. Nine or 10 contrary jurisdictions constitute a "substantial minority view" according to Prosser 912 and nn. 35–39. However, Prosser notes that this view is "largely confined to jurisdictions which do not allow the decedent to recover for his own curtailed life . . . ." *Id.,* at 912. As the Court points out, *ante,* at 593–594, the *Moragne* cause of action is not subject to that limitation.

The Restatement of Torts is also in direct conflict with the position taken by the Court:

> "Although the death statutes create a new cause of action, both they and the survival statutes are dependent upon the rights of the deceased. Hence where no action could have been brought by the deceased had he not been killed, no right of action exists. Likewise a release by the deceased or a judgment either in his favor or, if won on the merits, in favor of the defendant, bars an action after his death. . . . " [10]

Because of the likelihood of double recovery and the threat to repose inherent in the majority's holding, several leading commentators also favor the majority rule under the state wrongful-death statutes.[11] This is

---

[10] Restatement of Torts, Explanatory Notes § 925, comment *a*, p. 639 (1939). This position is repeated almost verbatim in the most recent working draft of the second Restatement. See Restatement (Second) of Torts, Explanatory Notes § 925, comment *a*, p. 196 (Tent. Draft No. 19, Mar. 30, 1973). See also Restatement of Torts, Explanatory Notes § 926, comment *a*, p. 646:

"[In those states with statutes combining the functions of a death statute and a survival statute] the representatives of the deceased can recover in a single action both for the damages preceding death and for those caused by the death. Even in such States, however, a judgment obtained by the deceased or a release of the cause of action by him terminates the right of action."

Accord, Restatement (Second) of Torts, Explanatory Notes § 926, comment *a*, p. 204. See also *id.*, Explanatory Notes § 925, comment *i*, p. 199:

"[A] release of his claim by the injured person bars an action after his death for causing the death, as also does a judgment either for, or if on the merits, against him given in an action brought by him for the tort."

[11] *E. g.*, 2 Harper & James, *supra*, at 1293–1294:

"If . . . deceased recovers before his death, his recovery for permanent injuries will be based, under the prevailing American rule, on

particularly true where, as here, the deceased in his own action has recovered his loss of earnings over his pre-accident life expectancy.[12] Even those opposed to the majority position under state law recognize the "force" of that view in such a case.[13]

---

his prospective earnings for the balance of his life expectancy at the time of his injury *undiminished by any shortening of that expectancy as a result of the injury.* Presumably any settlement would reflect the legal liability under this rule. The danger of double recovery becomes clear when it is recalled that any benefits of which the survivors were deprived, by the death, would have come out of these very prospective earnings if deceased had lived. At least in the case of serious and apparently permanent injuries, therefore, there is real danger of double recovery if a wrongful death action is allowed after recovery or release by deceased during his lifetime." (Emphasis in original; citations omitted.)

See *id.*, at n. 14: "[Double recovery] is a 'theoretical' as well as a 'practical' danger. . . . The prevailing rules . . . seem therefore to be fully justified." (Citation omitted.) See also Prosser 911: "The courts undoubtedly have been influenced by a fear of double recovery. This is of course possible in point of law, not only under the survival type of death act, but also in any jurisdiction where the decedent would be allowed to recover for the prospective earnings lost through his diminished life expectancy." (Citations omitted.) The latter appears to have been the measure of Mr. Gaudet's recovery in his personal-injury action. 463 F. 2d 1331, 1333 n. 1 (CA5 1972); Tr. of Oral Arg. 20–21.

[12] *E. g.,* Duffey, The Maldistribution of Damages in Wrongful Death, 19 Ohio St. L. J. 264, 273 (1958): In such cases, "[t]he recovery in the wrongful death action based on the decedent's future earning capacity is . . . simply a portion or segment of the larger recovery obtained by the injured person himself in the personal injury action." See n. 11, *supra.*

[13] Fleming 610. "[The fear of duplication of damages] has force . . . whenever allowance was made for prospective loss of earnings [in the decedent's own lawsuit], since this would have drawn on, or depleted, the fund contingently available to satisfy the dependants for loss of their expectancy of support." This commentator also states that the minority of state courts that do not view decedent recovery as a bar to a subsequent wrongful-death action and that

## III

The Court devotes a major portion of its opinion to the elements of damages recoverable under *Moragne*. *Ante*, at 584–591. In particular, the Court embraces the Court of Appeals' suggestion, 463 F. 2d 1331, 1333 (CA5 1972), that Mrs. Gaudet is entitled to seek damages for loss of "society," including love, affection, care, attention, companionship, comfort, and protection. *Ante*, at 585–590. Although I would not otherwise address the question of damages because I believe that no cause of action exists here, I think it important to note that the Court's holding that loss of society may be recovered is a clear example of the majority's repudiation of the congressional purposes expressed in the two federal maritime wrongful-death statutes.[14] The traditional admiralty view is that such nonpecuniary damages are not recoverable under the Death on the High Seas Act and the Jones Act.

The Death on the High Seas Act by its terms restricts recovery to pecuniary losses,[15] a restriction the lower

are "content with the bland assertion that no duplication of damages can arise because the release or recovery by the decedent *could not* have covered the period beyond his death . . ." are relying on a "protestation of faith rather than a conclusion drawn from proven facts . . . ." *Id.*, at 615 (emphasis in original).

[14] I do not address the correctness of the Court's holding that *Moragne* allows the recovery of loss of services, see, *e. g., Michigan C. R. Co.* v. *Vreeland*, 227 U. S. 59, 71, 73 (1913), or funeral expenses. Compare *Cities Service Oil Co.* v. *Launey*, 403 F. 2d 537, 540 (CA5 1968), with *Greene* v. *Vantage S. S. Corp.*, 466 F. 2d 159, 167 (CA4 1972).

[15] 46 U. S. C. § 762. Section 762 provides:

"The recovery in such suit shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought and shall be apportioned among them by the court in proportion to the loss they may severally have suffered by reason of the death of the person by whose representative the suit is brought."

federal courts have consistently read as excluding loss of consortium and similar nonpecuniary injuries to personal relationship, affections, and sentiments.[16] Because of its relationship to the FELA and its overlapping coverage with the Death on the High Seas Act, the Jones Act also has been read as forbidding recovery of the sentimental losses approved by the Court today.[17] Moreover, these well-established damages principles under the two federal maritime wrongful-death statutes, coupled with a concern for uniformity in admiralty law, have led most lower courts that have taken part in the continuing development of the *Moragne* cause of action to conclude that the affection-related damages endorsed by the Court are not recoverable under *Moragne*.[18] These courts have

---

[16] *E. g., Igneri* v. *Cie. de Transports Oceaniques,* 323 F. 2d, at 266 n. 21; *Middleton* v. *Luckenbach S. S. Co.,* 70 F. 2d 326, 330 (CA2), cert. denied, 293 U. S. 577 (1934). See *Dugas* v. *National Aircraft Corp.,* 438 F. 2d 1386, 1392 (CA3 1971) ("The amount of recovery under the Death on the High Seas Act is determined by the actual pecuniary loss sustained by the beneficiary due to the wrongful death").

[17] *E. g., Igneri* v. *Cie. de Transports Oceaniques, supra,* at 266 ("[I]t is established . . . that the damages recoverable by a seaman's widow suing for wrongful death under the Jones Act do not include recovery for loss of consortium"). Cf. *Cities Service Oil Co.* v. *Launey, supra,* at 540. See *Gulf, C. & S. F. R. Co.* v. *McGinnis,* 228 U. S. 173, 175 (1913); *Michigan C. R. Co.* v. *Vreeland, supra,* at 68, 70–71; G. Gilmore & C. Black, The Law of Admiralty 306 (1957):

"Recovery under the High Seas Act like that under FELA § 51 [and thus the Jones Act] is based on pecuniary loss to the beneficiaries as a result of the wrongful death. The damage calculation therefore involves an estimate of what the decedent's life expectancy would have been, his probable earnings during that period and the amounts he would have contributed to beneficiaries."

[18] *E. g., Simpson* v. *Knutsen,* 444 F. 2d 523 (CA9 1971); *Petition of United States Steel Corp.,* 436 F. 2d 1256, 1279 (CA6 1970), cert. denied, 402 U. S. 987 (1971); *In re Cambria S. S. Co.,* 353 F. Supp. 691, 697–698 (ND Ohio 1973); *Green* v. *Ross,* 338 F. Supp.

heeded *Moragne*'s admonition not to fashion a whole new body of law, yet their holdings are disapproved by the majority. *Ante,* at 588 n. 23.

## IV

The reasons underlying the extensive state and admiralty precedent contrary to the Court's holding that this action may be brought are not difficult to discern. The majority's statement that this precedent rests not so much on policy as on "statutory limitations on the wrongful-death action . . . ," *ante,* at 579, is erroneous.[19] The

---

365, 367 (SD Fla. 1972); *Petition of Canal Barge Co.,* 323 F. Supp. 805, 820–821 (ND Miss. 1971). The state courts of Louisiana, the State where Mr. Gaudet's injuries occurred, have reached the same result. *Strickland* v. *Nutt,* 264 So. 2d 317, 322 (La. App.), aff'd *sub nom. DeRouen* v. *Nutt,* 262 La. 1123, 266 So. 2d 432 (1972). ("The *Moragne* case, with the desire for uniformity in maritime death actions announced therein, precludes loss of love and affection as an element of damage here.")

Only one Fifth Circuit case, other than the instant case, and two cases from the United States District Court for the Eastern District of Louisiana have concluded that *Moragne* signaled a break with settled admiralty wrongful-death damages rules. *Dennis* v. *Central Gulf S. S. Corp.,* 453 F. 2d 137, cert. denied, 409 U. S. 948 (1972); *In re Farrell Lines, Inc.,* 339 F. Supp. 91 (1971); *In re Sincere Navigation Corp.,* 329 F. Supp. 652 (1971). In the latter case, the court candidly admitted that its decision "may conflict with *Moragne*'s goal of uniformity of recovery for all who perish on navigable waters." *Id.,* at 657.

[19] The majority's opinion, apparently in an effort to avoid the force of precedent contrary to its view, contrasts disparagingly these statutes with the more "humane" judge-made rule of *Moragne.* *Ante,* at 581–583. But the majority ignores the extent to which the Court in *Moragne* expressly identified its holding with the policy and principles of the very statutes now criticized:

"The policy thus established [by the state and federal wrongful-death statutes] has become itself a part of our law, to be given its appropriate weight not only in matters of statutory construction

large number of courts that have refused to adopt the majority's view have done so for very good, practical reasons. The Court has adopted a rule that will be difficult to administer, that presents a serious risk of unfairness for those in petitioner's position, and that fails to foster the law's normal regard for finality.

The majority's position requires it to establish procedures to prevent a double recovery of the elements of damages awarded Gaudet in his own lawsuit. This is no easy task, as "[i]t should be obvious that as yet no satisfactory systematic solution to the whole [double recovery] problem has been found." [20] The Court adopts a collateral estoppel theory, and apparently would implement this by treating the injured seaman as a "fiduciary" for his dependents. *Ante,* at 593–594. Apart from the utter novelty of this extension of the law of trusts and fiduciary duties, the majority's estoppel theory is hardly a "satisfactory solution" to the problem of unfair recoveries.[21] Apparently the Court intends to limit the ele-

---

but also in those of decisional law." 398 U. S., at 390–391. And, again:

"Both the Death on the High Seas Act and the numerous state wrongful-death acts have been implemented with success for decades. The experience thus built up counsels that a suit for wrongful death raises no problems unlike those that have long been grist for the judicial mill." *Id.,* at 408.

Contrary to the Court's intimations, there is no basis for suggesting a tension between these statutes and *Moragne.* Indeed, it is clear from the *Moragne* opinion that the Court relied upon the statutes in its analysis, sought only to fill a narrow gap in the law left by them, and considered that the statutes afforded "persuasive analogy for guidance" in developing the *Moragne* cause of action. *Ibid.*

[20] Prosser 912 (footnote omitted).

[21] The theory probably creates more problems than it resolves. What are the boundaries of the class of potential beneficiaries who are estopped to relitigate loss of support? If a seriously injured person is the fiduciary for an undefined class of potential beneficiaries, may he be enjoined from wasting his assets or disinheriting members

ments of proof of damages that may be introduced at the second trial. But this will in no way guarantee that the second trier of fact will succeed in compartmentalizing the allowable from the unallowable elements of damages in the second trial. The highly conceptualized nature of the parsing of categories of damages undertaken by the Court suggests how unlikely it is that the majority's theoretical distinctions will be meaningful in practice. And control by way of appellate review of the injustices that are bound to occur will be, practically speaking, an impossible task.

Mr. Gaudet's judgment was given by a jury. It would be unrealistic to assume that that verdict was restricted to an objective measurement of Gaudet's lost earnings plus the "value" of his pain and suffering. In all likelihood, Gaudet's award reflected an element of the jury's concern for a permanently disabled working man. As anyone who has tried jury cases knows, jury sympathy commonly overcomes a theoretical inability to recover for such intangibles as loss of society. If Mrs. Gaudet is then allowed to recover in her subsequent lawsuit the full value, whatever that is, of her loss of love, attention, care, affection, companionship, comfort, and protection, she will be given a second opportunity to benefit from the imprecision built into any award for injuries that cannot be measured objectively. The Gaudet family may well then receive substantially more than just compensation for its injuries.

One expression of jury sympathy is commonplace, despite its conflict with the damages principles that in theory control. But certainly two opportunities for

of his family? There will also be some nice questions under the majority's approach about whether a particular item of proof at the second trial is to be introduced with regard to the forbidden issue of support or the permissible issue of, say, services.

jury sentiment cross the line between benignity and bonanza and should not be sanctioned. And, it is in those cases where the decedent's suit and the subsequent *Moragne* wrongful-death action are both tried to juries that the majority's procedures for preventing a windfall are most likely to break down. Since it is an admiralty action, a *Moragne* claim by itself will not entitle the wrongful-death claimant to a jury. But there will be cases in which the claimant will be able to join a state law action to a *Moragne* claim and obtain a jury for both, either in state or federal court. See, *ante,* at 589 n. 24. When that happens, those in petitioner's position will be subjected twice to the vagaries of a jury, the second time on such wide-open damages concepts as those embraced by the majority.

The Court's approval of a second recovery based on the same wrong for which decedent already had recovered, compounded by its rejection of traditional admiralty "pecuniary loss" damage standards, seems particularly inappropriate given the nature of the claim relied on by both Gaudets. The maritime concept of unseaworthiness is not based on fault. The doctrine has evolved into a judicially created form of strict liability.[22] When the law imposes absolute liability, it often restricts recovery to damages for those injuries that are clearly ascertainable and susceptible of monetary compensation. *E. g., Igneri* v. *Cie. de Transports Oceaniques,* 323 F. 2d 257, 268 (CA2 1963), cert. denied, 376 U. S. 949 (1964). This reflects the impossibility of deterrence and the inappropriateness of punishment in many cases where liability is absolute. The Court has broken with that wise rule of social policy in this case.

---

[22] *Moragne* v. *States Marine Lines,* 398 U. S., at 399. Cf., Comment, Maritime Wrongful Death After *Moragne:* The Seaman's Legal Lifeboat, 59 Geo. L. J. 1411 n. 4 (1971).

The Court also has ignored the law's normal regard for an end to duplicative litigation arising from the same transaction. After her husband's judgment was affirmed on appeal,[23] Mrs. Gaudet commenced this action by, in essence, changing a few lines in her husband's complaint and filing it again in the same United States District Court as a *Moragne* wrongful-death action. That court's dismissal of Mrs. Gaudet's complaint on *res judicata* grounds [24] is hardly surprising, given the striking similarities between the two Gaudet complaints. Both complaints were based on the maritime doctrine of unseaworthiness, a condition that Mrs. Gaudet alleged was established as a matter of *res judicata* by Mr. Gaudet's successful lawsuit. App. 2, 5–6. The same facts and injuries were alleged. *Id.*, at 1–2, 4–5. Both sought recovery, in the amount of $250,000. *Id.*, at 2, 6. Whereas Mr. Gaudet had sought recovery for lost earnings, *id.*, at 2, Mrs. Gaudet sought compensation for her "severe financial loss." *Id.*, at 5. Thus, on the face of the complaints, Mrs. Gaudet apparently sought recovery solely for elements of damages that had been encompassed by her husband's judgment.[25]

There should be strong reasons of policy to justify such repetitive suits and to impose on petitioner the attendant doubling of litigation expenses. The reasons advanced by the majority opinion do not, in my view, approach that level of persuasion. Petitioner has already fully litigated, and paid, a large judgment com-

[23] *Stein* v. *Sea-Land Services, Inc.*, 440 F. 2d 1181 (CA5 1971). It might be noted that because Gaudet's death intervened between the jury verdict and the appeal, his recovery went directly to his estate, not to him personally.

[24] Pet. for Cert. 17.

[25] Although the majority fails to address the point, presumably its result means that Mrs. Gaudet must at least amend her complaint upon remand to the District Court.

pensating Gaudet's estate for the injuries Gaudet incurred on board its vessel. Ordinarily, petitioner would have been able to consider the case closed and to order its affairs on the basis of a verdict affirmed on appeal. Today's result deprives petitioner of that reliance interest, subjecting it to another round of litigation with wide-open damages possibilities. The admiralty precedents, the prevailing weight of state law, and elementary fairness call for relieving petitioner of that unjustifiable burden.

As noted at the outset of this dissent, the Court has written new admiralty law as to the right of survivors to recover for wrongful death and has expanded significantly the elements of damages recoverable. In reaching these results, the majority opinion has discredited, if not in substance overruled, the unanimous decisions of the Court in the *Mellon* and *Flynn* cases. In *Moragne,* a decision on which I believe the majority places a mistaken reliance, the Court emphasized its reluctance to disregard or overrule established precedent:

> "Very weighty considerations underlie the principle that courts should not lightly overrule past decisions. Among these are the desirability that the law furnish a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; the importance of furthering fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case; and the necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments. The reasons for rejecting any established rule must always be weighed against these factors." 398 U. S., at 403.

Mr. Justice Harlan, for the Court, then went on to state with care the reasons for rejecting *The Harrisburg*

rule, described as an "unjustifiable anomaly." *Id.,* at 404. The substantive rule rejected today is no comparable anomaly. It has been the generally applied doctrine since wrongful-death actions were introduced in this country. It has been the rule of the relevant federal statutes since their inception, and Congress has not modified the rule during that entire period. It was the rule announced in *Mellon* and *Flynn, supra,* cases the Court chooses not to follow today. And, unlike the opinion in *Moragne,* the majority has not provided, in my view, sound reasons of precedent or policy for overturning the rule.