506 F.2d 716
 Mitchell P. SKIDMORE, on his own behalf, as Administrator of
the Estate of Vagelean Skidmore and as guardian of Claudia
Howell and of Mitchell P. Skidmore III, and Teresa Howell,
Plaintiffs-Appellants-Cross Appellees,
v.
Wilbur H. GRUENINGER et al., Defendants-Appellees-Cross
Appellants, Ohio River Company et al., Defendants-Appellees.
 No. 74-1548.
 United States Court of Appeals, Fifth Circuit.
 Jan. 20, 1975, Rehearing Denied March 31, 1975.
 
 Neal D. Hobson, James K. Irvin, New Orleans, La., for plaintiffs-appellants-cross appellees.
 Evangeline T. M. Vavrick, New Orleans, Las., for Grueninger, and others.
 George B. Matthews, Donald Hoffman, New Orleans, La., for Ohio River.
 J. Dwight LeBlanc, Jr., New Orleans, La., Elmer Tapper, Raymond McDougall, Chalmette, La., for Fidelity Etc.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before BROWN, Chief Judge, and COLEMAN and DYER, Circuit Judges.
 COLEMAN, Circuit Judge.
 
 
 1
 In the early morning hours of May 18, 1968, on the Ohio River, near Huntington, West Virginia, an eighteen foot inboard-outboard pleasure craft collided with a moored and loaded coal barge. This maritime wrongful death action followed.
 
 
 2
 Except in one particular, for which a remand is required, the Judgment of the District Court is affirmed.
 
 
 3
 Of the five passengers aboard the pleasure craft, four perished and their bodies were never found.
 
 
 4
 Vagelean Skidmore was one of the unfortunate four. Her husband, Mitchell P. Skidmore, instituted suit in his own behalf, as administrator of the estate of his deceased wife, and as guardian to his wife's children. He sued the personal representative of the operator of the boat, the personal representative of the boat owner (both victims of the collision) and the barge owner, the Ohio River Company. Additionally, Teresa Howell, adult daughter of Mrs. Skidmore, sued on her own behalf.
 
 
 5
 Recovery was sought, respectively, for loss of the wife's services, loss of society and consortium, loss of support, and loss of nurture and guidance to the minor children.
 
 
 6
 In the District Court judgment was rendered in favor of plaintiff Skidmore in his own capacity and as representative for Mrs. Skidmore's minor children against the representative of the owner of the motorboat and its operator. Damages were awarded for loss of Mrs. Skidmore's services and for the loss of her nurture and guidance to her minor children. No recovery was allowed on Skidmore's claims for loss of consortium and society and for loss of support. The claim of Teresa Howell was dismissed altogether. Skidmore's claim, and the cross claims of the motorboat owner and operator, against the barge company were dismissed. Finally, the trial court found no contributory negligence on the part of Mrs. Skidmore with respect to her actions prior to the collision. (Skidmore v. Grueninger, No. 70-1015 (E.D.La., filed Jan. 7, 1974)-- unreported memorandum opinion of the District Court).
 
 
 7
 Skidmore appeals the holding that the barge company was not liable and the denial of recovery for loss of decedent's society, consortium and support. Teresa Howell appeals the dismissal of her claim. The representatives of the owner and driver of the motorboat (defendants below) cross appeal the determination of no liability on the part of the barge company as well as the determination of no contributory negligence on the part of Mrs. Skidmore.
 
 
 8
 As already indicated, we affirm the District Court on all issues except its denial of recovery for loss of consortium and society. On these issues we reverse and remand on the basis of Sea-Land Services v. Gaudet, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), decided by the Supreme Court subsequent to the District Court trial.
 
 
 9
 We present a slightly condensed version of the extensive findings of the District Court. Key factual considerations include (1) the condition of Mike Keenan, operator of the motorboat; (2) the condition of Charles Keenan, owner of the boat; (3) the number and arrangement of lights at the Ohio River Company's barge facility; and (4) the manner in which Mike Keenan operated the boat prior to its collision with the barge.
 
 
 10
 On Friday evening, May 17, 1968, Vagelean Skidmore, Charles Keenan, Leona May Rowe, and William Keener had planned to join up for an evening of entertainment, which was to include a ride in Charles Keenan's motorboat with stops at various spots along the Ohio in the vicinity of Huntington for drinking and dancing.
 
 
 11
 About 6:30 p.m., Charles Keenan, Mrs. Skidmore, and Michael Keenan (son of Charles) were having some beer at the R K pizza restaurant, operated by Mrs. Skidmore. They were joined by Keener and Ms. Rowe. After remaining for about an hour at the R & K for more beer, the group, with the exception of Mike Keenan, set out for Charles' boat at the Guyandotte boat dock. At the boat dock the two couples boarded Keenan's boat, an 18 foot fiberglas pleasure craft with a 150 horsepower inboard-outboard motor, and headed down the ohio to the 10th Street boat dock. In going downstream they passed the barge fleet, coal tipple, and repair shops of the Ohio River Company, located on the left bank of the River about a mile and a half above the 10th Street dock. The trip downstream was uneventful.
 
 
 12
 At the 10th Street dock the group disembarked and proceeded to a lounge, where they had alcoholic beverages and danced for about two hours. They were joined there by Mike Keenan, who continued his consumption of alcoholic beverages, gebun earlier that afternoon. Leaving Mike at the 10the Street dock, the couples returned to Charles Keenan's boat and headed downstream several miles to the Ashland Oil and Refining Company dock, where they tied up and caught a taxi to the Ceredo Lounge. There they met Mike Keenan and his uncle, Robert keenan, who, about a half hour earlier, had driven Mike to the lounge from the 10th Street dock. Soon after the two couples arrived, about 11:30 p.m., Robert Keenan left the group, admonishing his brother to be very careful in navigating the return trip upriver. After more drinking and dancing, the two couples and Mike Keenan left the Ceredo Lounge at 2:00 a.m. and returned to the boat.
 
 
 13
 At this juncture Mike Keenan assumed the controls. He pulled away from the Ashland Refinery dock at a high rate of speed and commenced turning the craft in a series of tight circles and zig-zag maneuvers out into the river. Ms. Rowe became frightened by these erratic maneuvers and requested Charles Keenan to take over operation of the boat. Mike, however, remained at the controls.
 
 
 14
 Sometime after this, the Keenan motorboat collided with barge OR-937, which was moored at the facility of the Ohio River Company, approximately 10 miles upstream from the Ashland Oil Refinery dock. The precise details of the collision are unknown. The lone survivor, Leona May Rowe, does not recall the impact or an explosion. Three Ohio River Company employees on duty that night heard a sound like an explosion and rushed to investigate, but none saw the actual collision. The record shows that at the time of impact, or immediately thereafter, the Keenan craft caught fire and burned while rescue efforts were being made. The bodies of the other four occupants of the boat were never recovered.
 
 
 15
 The record further shows that barge OR-937 was the outermost barge in Ohio's fleet, which was moored in a roughly triangular formation extending outward from the West Virginia bank. (See Exhibit 1 appended hereto.) The barge was moored parallel to the bank with its bow upstream and the stern downstream. From the West Virginia bank, the downstream, outermost corner of the barge protruded approximately 264 feet into the river channel. The Keenan boat struck the headlog across the stern of OR-937 about 6 feet inside the barge's outermost downstream corner, or approximately 258 feet from the West Virginia bank. The approximate point of impact is designated point 'C' on the exhibit. Debris from the boat was scattered across the deck of the barge and across part of its load of coal, indicating that at the time of the collision the Keenan craft was traveling at a relatively high speed.
 
 
 16
 The evidence further indicates that Charles Keenan and Mike Keenan were both intoxicated at the time of the accident, Mike Keenan being described as 'highly intoxicated'. The Ohio River in the vicinity of the collision is 1200 to 1400 feet wide and the sailing line, which indicates maximum depth, is about 700 feet from the West Virginia bank. The river was running high and fast in mid-May of 1968, with a current of some 10 knots and logs and debris present. The river, however, was navigable from bank to bank, particularly for a small craft like the Keenan boat. The Ohio is straight for several miles below the Ohio River Company facility; and though there was no moon, visibility was clear for several miles.
 
 
 17
 Turning now to the exhibit, the evidence establishes that there was a lantern burning at the outermost downstream corner of OR-937 (* on exhibit), but the evidence neither establishes nor refutes the existence of a lantern at the outermost upstream corner of OR-937 (? on exhibit). In addition there was a lantern burning on the outermost downstream corner of the downstream empty barge (* on exhibit). These lanterns were placed approximately 4 feet above the water, and they produced a light visible for at least a mile on a clear night. Besides these barge lanterns, the Ohio River Company facility was well lighted by a number of electric lights on the two tow boats (M/V Wharton and M/V Stephens), the upper and lower landing boats, and the dry dock. Twenty-five to thirty of these lights, including a floodlight which shined downriver over the empty barges, were permanent installations. There were no lanterns on the loaded downstream barges designated numbers 2-5 on the exhibit.
 
 
 18
 At the time of the collision Mike Keenan, the operator of the boat, appears to have been the only occupant of the boat in a position to see the navigational conditions and lights upstream. Charles Keenan and Vagelean Skidmore were lying down on a fold out seat on the left side of the boat with their heads toward the bow. Leona May Rowe and William Keener were seated on the right side of the boat facing the left rear corner of the craft. Since Mike Keenan was standing at the controls, directly forward of Ms. Rowe and Keener, their view toward the bow would be accordingly obstructed.
 
 I. Liability of the Barge Company
 
 19
 On appeal it is undisputed that (1) the Keenan boat was operated in an unseaworthy manner, (2) Mike Keenan was intoxicated and unfit to operate the craft, (3) Charles Keenan was negligent in allowing Mike to operate the craft, and (4) Mike Keenan failed to maintain a proper lookout.
 
 
 20
 Moreover, it is undisputed that the District Court correctly recognized the rule that where a moving vessel colides with a vessel at anchor the moving vessel is presumed to be at fault, The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1894); The Clarita, 90 U.S. (23 Wall.) 1, 13, 23 L.Ed. 146 (1874); Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co., 5 Cir., 1967, 377 F.2d 724, 726. Rather, appellants contend that the trial court erred in not invoking the rule of The Pennsylvania,[1] that in collision cases where one vessel has violated a safety statute or regulation, such vessel with be presumed to be at fault, and in order to escape fault the vessel must show not only that the violation did not cause the collision but that it could not have caused it. The Pennsylvania, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874).
 
 
 21
 Appellants assert that the Ohio River Company was in violation of33 C.F.R. 95.36 (1974)[2] by failing to have a lantern placed on the outermost upstream corner of OR-937. Even though the trial court was unable to determine with certainty either the existence or absence of this lantern, appellants contend that once the lack of proper lighting is placed in issue, The Pennsylvania rule requires the burden of proof to shift to the defendant to show that proper lighting existed, or if not, that the absence of lights did not and could not have caused the collision. As support for their position, appellants cite Rogers v. Saeger, 10 Cir., 1957, 247 F.,2d 758. We cannot agree with appellants' argument.
 
 
 22
 It seems clear that in order for a plaintiff to be within The Pennsylvania rule, he must demonstrate by a preponderance of the evidence that a statutory violation has occurred. This reasoning is consistent with the normal rules for presumptions and burden of proof-- that in order for a fact to be presumed the existence of a preliminary fact must be proved by a preponderance of the evidence. The Pennsylvania rule is, in effect, a presumption: i.e., fault on the part of a vessel will be presumed only when it is proven by a preponderance of the evidence that a statutory violation has taken place. Hence, where the statutory violation is not satisfactorily proved, no fault can be presumed.
 
 
 23
 In Diesel Tanker F. A. Verdon, Inc. v. Stakeboat No. 2, 2 Cir., 1965, 340 F.2d 465, the Second Circuit was faced with a factual situation similar to the one we have here, where plaintiffs urged application of The Pennsylvania rule, but were unable to show that defendant's vessel had violated the lighting regulations. In dismissing plaintiff's claim, the Court noted that in bringing an action, the plaintiff had assumed the affirmative and the burden of proof would remain on plaintiff to prove that defendant's vessel was improperly lighted. Failing to carry that burden of proof, plaintiff's action had been properly dismissed. 340 F.2d at 467, citing Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 112-113, 62 S.Ct. 156, 86 L.Ed. 89 (1941).
 
 
 24
 Though appellants contend that the Tenth Circuit would take a different view, our reading of Rogers v. Saeger, 10 Cir., 1957, 247 F.2d 758, does not support their position. In Rogers v. Saeger the existence of a lighting violation was undisputed. Therefore, the Court did not have to make a determination as to how the burden of proof would have been allocated in the presence of a genuine controversy as to the existence of a statutory violation. Hence, we discern no conflict between our view and that of the Tenth Circuit.
 
 
 25
 Appellants assert in the alternative that the trial court erred in not finding that the barge OR-937 was improperly lighted. After reviewing the depositions of four witnesses who testified on the question of whether there were lanterns on each of the outermost corners of OR-937, the trial court reached this conclusion:
 
 
 26
 We are convinced there was a light aboard the OR-937 at its outboard downriver corner before, at and after the collision, but we are unconvinced that there was no light at its outboard upriver corner.
 
 
 27
 Plaintiffs have failed to prove by a preponderance of the evidence that the upstream channelward corner of the OR-937 was not lighted prior to and at the time of the collision.
 
 
 28
 Notwithstanding conflicts in the testimony of the four witnesses,[3] appellants argue that the trial court was in error in failing to conclude that there was no light on the outermost upstream corner of OR-937. Relying on the fact that the bulk of the evidence relating to the collision was presented in the form of depositions and documents, appellants urge this Court to exercise substantial latitude on review, since, in examining the record, we are in as good a position as the trial court to make credibility choices. We concede that we may review the entire record on appeal, but in reaching different conclusions as to the facts, we are still bound by the clear mandate of MacAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954), which requires that in admiralty cases a Court of Appeals may not set aside the judgment of a lower court unless it is 'clearly erroneous'. Caradelis v. Refineria Panama, S.A., 5 Cir., 1967, 384 F.2d 589, 593-594; Rule 52(a), Fed.R.Civ.P., 28 U.S.C.A.
 
 
 29
 The 'clearly erroneous' rule of MacAllister is subject to some modification, however, in those cases where there is little or no 'live testimony' in the trial court. In reviewing such a case, Judge Godbold stated for this Court:
 
 
 30
 We feel that while we may not consider the evidence de novo and must give considerable weight to the findings of the district court, we may reexamine the evidence more closely than if the clearly erroneous rule was fully applicable.
 
 
 31
 Caradelis v. Refineria Panama, S.A., 5 Cir., 1967, 384 F.2d 589, 593-594; see Emmco Ins. Co. v. Wallenius Caribbean Line, S.A., 5 Cir., 1974, 492 F.2d 508, 512; San Pedro Compania Armadoras, S.A. v. Yannacopoulos, 5 Cir., 1966, 357 F.2d 737, 740; Spanos v. The Lily, 4 Cir., 1958, 261 F.2d 214. The extent of the modification of the clearly erroneous rule in those cases where a trial court is presented little or no live testimony is an undecided matter. Nevertheless, where the conclusions of the trial judge may reasonably be inferred from the record, such conclusions should not be disturbed on appeal. This is true even though conflicting inferences of equal reasonableness may be drawn from a review of the same body of evidence. MacAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Movible Offshore, Inc. v. M/V Wilken A. Falgout, 5 Cir., 1973, 471 f.2d 268, 271; Caradelis v. Refineria Panama, S.A., 5 Cir., 1967, 384 F.2d 589, 595.
 
 
 32
 With respect to the instant case, after thoroughly reviewing the record[4] and applying the above standard to the findings of the trial judge, we cannot say that the findings of the District Court are clearly erroneous. Even though some conflicts in the testimony do exist, we conclude that the facts found by the District Judge are permissible.[5] We agree that plaintiffs (appellants) failed to prove by a preponderance of the evidence that there was no light on the OR-937 at its outermost upstream corner prior to and at the time of the collision.
 
 
 33
 Appellants next assert that the District Court erred in failing to find that the lack of lights on the downstream loaded barges in the Ohio fleet was a contributing cause of the collision. The barges which appellant refers to are designated numbers 2-5 on the exhibit attached hereto. Implicit in appellants' argument is the assumption that Coast Guard regulations[6] require these barges to carry lights. A finding that such lights are required would trigger application of the Pennsylvania rule,[7] since the record establishes that no lights were in fact displayed on these barges.
 
 
 34
 To determine whether lights were required, we turn to the controlling regulations, 33 C.F.R. 95.36(a), (b)(3), and (c)(2) (1974), which provide:
 
 
 35
 Lights for barges at bank or dock.
 
 
 36
 (a) Lights for barges at bank or dock in the Mississippi River and its tributaries and in the Atchafalaya River above its junction with the Plaquemine-Morgan City Alternate Waterway shall be as required by this section.
 
 
 37
 (b) The following barges, when moored in or near a fairway except those barges exempted under the provisions of paragraph (e) of this section, shall display between the hours of sunset and sunrise the barge lights described in paragraph (c) of this section:
 
 
 38
 (3) Barges moored in fleets more than two barges wide or to a miximum width of over 80 feet, parallel to the bank.
 
 
 39
 (c) Barges required to be lighted under paragraph (b) of this section shall carry two white lights of such character as to be visible on a dark night with a clear atmosphere at a distance of at least 1 mile, so located as to give unobstructed view and arranged as follows:(2) On barges moored in group formation, a light on the upstream outboard or channelward corner of the outer upstream barge and a light on the downstream outboard or channelward corner of the outer downstream barge. In addition, any barge projecting toward or into the channel in such a group formation shall have two white lights similarly placed on the outboard or channelward corners of the barges.
 
 
 40
 The design or scheme of these regulations seems to be this: part (a) sets out the jurisdiction of the regulations; part (b) sets out which barges or groups of barges are subject to the lighting requirement; and part (c) describes the type and number of lights required on barges, or groups of barges, and how these lights must be arranged. Turning now to the exhibit, we must apply the regulations to barges designated numbers 2-5. First of all, there is no question as to jurisdiction under part (a); the Ohio River is undeniably a tributary of the Mississippi. As for part (b), it seems clear that barges 2-5, along with Ohio's other loaded barges, are covered by (b)(3); these barges were moored in a group formation more than two barges wide or to a maximum width of over 80 feet, parallel to the bank. Since it is established under part (b) that the Ohio barges must be lighted, we now turn to part (c) to determine the type, number and arrangement of lights required. Part (c)(2) states that for barges moored in group formation a light is required on the outermost upstream corner of the outermost upstream barge, and a light is required on the outermost downstream corner of the outermost downstream barge. In this case, the OR-937 was the single outermost barge, so it follows that lights were required on its outermost upstream and downstream corners.
 
 The last part of (c)(2) then states:
 
 41
 In addition, any barge projecting toward or into the channel in such a group formation shall have two lights similarly placed on the outboard or channelward corners of the barge.
 
 
 42
 This part of the regulations is intended to apply to barges which project into the channel, breaking the square lines of the group formation, i.e., barges which are not flush with the remainder of the group. None of the barges designated 2-5 on the exhibit however, are covered by this part of the regulations, for none of these barges project toward or into the channel, breaking the formation established by the outermost barge. Instead barges 2-5 are flush with the outermost barge (OR-937); hence, they do not fall within the purview of the last part of part (c)(2).
 
 
 43
 This interpretation of the regulations is in harmony with the regulations' underlying policy of maximizing safety and economy by requiring placement of lights only at the most strategic points. In conclusion, we reject appellants' contention that barges 2-5 were required by regulations to display lights.
 
 
 44
 Since we have concluded that the evidence fails to show that the Ohio River Company was guilty of any statutory lighting violations on either the OR-937 or barges 2-5, appellants' assertion that Ohio failed to prove that the alleged absence of lights could not have caused the collision is rendered academic, or moot. Assuming arguendo, however, that violations did exist, we would agree with the District Court's conclusion that the absence of lights on the outermost upstream corner of OR-937 or on barges 2-5 could not have possibly caused the collision.
 
 II. Contributory Negligence
 
 45
 The representative of Charles Keenan and Mike Keenan, cross appellant in this case, contends that the claims of Mitchell Skidmore and Teresa Howell should be reduced or denied because of alleged contributory negligence on the part of Mrs. Skidmore. Cross appellant asserts that Mrs. Skidmore was contributorily negligent in the following respects: (1) She was intoxicated at the time of the trip back upriver from the Ashland Oil Company dock, (2) she knew or should have known that Charles Keenan and Mike Keenan were intoxicated and unfit to operate the boat in a safe manner on the trip back upstream, (3) she had an opportunity to avail herself of transportation home by means of a taxicab but failed to do so, and (4) she failed to request a life jacket and was not wearing a life jacket at the time of the collission.
 
 
 46
 Although the argument of the cross appellant is not altogether implausible, there is little evidence in the record to substantially buttress his contentions. After reviewing the relevant evidence, the trial judge resolved:
 
 
 47
 Although there is evidence that Vagelean Skidmore had indulged in alcoholic beverages, the evidence is insufficient to warrant a finding that she was contributorily negligent solely because cause of intoxication. Nor is there evidence which would allow us to conclude that she was negligent for failure to prevent careless operation of the boat by Mike Keenan. Absent evidence that she was qualified to operate the boat, she cannot be faulted with failure to do so if it were otherwise possible for her to assume the controls. We find the evidence insufficient to find negligence on the part of Mrs. Skidmore for refusing to board the vessel on the return trip. While she must be held to be aware that Charles Keenan had been drinking, there is no evidence that he could not have properly operated the boat, nor is there evidence that he would not operate it before Mike Keenan began doing so. Although Charles Keenan had been imbibing for several hours at the time the downriver trip was made with him at the controls, the trip was uneventful and no evidence of careless operation has been adduced. When it was known that Mike Keenan, rather than his father, would be piloting the boat, any protestations as to the manner of his operation, and there is no evidence that Mrs. Skidmore did or did not protest, would, we believe, have been vain and useless. Even if we could find negligence on the part of Mrs. Skidmore in the respects discussed, we cannot conclude it was a proximate cause of the collision.
 
 
 48
 We think this was a permissible assessment of the issue of contributory negligence and we are unable to conclude that that court was clearly erroneous. MacAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Rule 52(a), Fed.R.Civ.P., 28 U.S.C.A.
 
 
 49
 The District Court, however, did not discuss the issue of whether Mrs. Skidmore was contributorily negligent in not requesting and wearing a life jacket. An examination of the record reveals only a modicum of evidence on this point. In fact, the only conversation regarding life jackets took place in the course of Coast Guard Chief Warrant Officer Gregory's interrogation of Ms. Rowe two days after the accident.[8] There is little substantial evidence in this exchange to even indicate that the Keenan boat was equipped with life jackets. Further, even if the Keean boat was so equipped, Ms. Rowe's statements indicate that they were not placed in plain view of the occupants. Ms. Rowe made no comments as to whether Mrs. Skidmore requested a life jacket or whether Mrs. Skidmore was even aware that life jackets were available. In addition, there is substantial evidence in the record to indicate that even if Mrs. Skidmore had been wearing a life jacket she nevertheless would have perished in the collision. The Keenan boat caught fire at the time of impact, and since the bodies of the four victims were never recovered it is unknown whether their deaths were caused by burns or drowning. A life jacket would be of little service in the midst of a flaming vessel.
 
 
 50
 Upon review of this very sketchy testimony we are unable to conclude that the trial judge's holding that Mrs. Skidmore was not contributorily negligent was clearly erroneous. MacAllister v. United States,348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Rule 52(a), Fed.R.Civ.P., 28 U.S.C.A. Although cross appellant raises an interesting and novel point here with regard to their argument that a passenger in a boat is under a duty to request and wear a life jacket,[9] he simply failed to submit any substantial or concrete evidence on the issue. Since contributory negligence is an affirmative defense, cross appellant was under an obligation to prove its allegations by a preponderance of the evidence, and this it clearly failed to do.
 
 
 51
 The cross appellant also contends that Mrs. Skidmore should be barred from recovery because of the doctrine of assumption of risk. However, we feel that this claim, like the claim of contributory negligence, must fall on the basis of failure of proof. Further, this Court has held that the doctrine of assumption of risk does not apply in maritime cases where seamen are not involved. Movible Offshore Co. v. Ousley, 5 Cir., 1965, 346 F.2d 870, 873.
 
 
 52
 III. Recovery for Loss of Society, Consortium and Support
 
 
 53
 The District Court, in granting recovery to appellants, denied their claim for loss of society and consortium on the basis of Canal Barge Co. v. Griffith, 5 Cir., 1973, 480 F.2d 11, and their claim for loss of support on the basis of insufficient evidence, or failure of proof. Subsequent to the decision of the lower court and during the pendency of this appeal, the Supreme Court overturned the Canal Barge line of cases and ruled that survivors in a maritime wrongful death action may be allowed recovery for loss of support, services, society and funeral expenses. Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 584, 94 S.Ct. 806, 814, 39 L.Ed.2d 9 (1974). In Sea-Land Services the Supreme Court, without specific mention, implicitly recognized that recovery for loss of consortium should be allowed in maritime wrongful death actions as well. 414 U.S. at 584-590, 94 S.Ct. at 814-817, 39 L.Ed.2d at 20. Following the Supreme Court's directive that the maritime wrongful death remedy should reflect the 'humanitarian policy of the maritime law to show 'special solicitude' for those who are injured within its jurisdiction', 414 U.S. at 588, 94 S.Ct. at 816, 39 L.Ed.2d at 22, we hold that loss of consortium is a compensable harm.[10]
 
 
 54
 Despite its decision to liberalize damage awards in maritime wrongful death actions, the Supreme Court in Sea-Land Services was very much aware of the undesirable possibility of double recoveries. To prevent double recoveries, the Court suggested that each element of damages be clearly defined to allow the different awards to be separated. 414 U.S. at 591-594, 94 S.Ct. at 818-819, 39 L.Ed.2d at 25. In the case presently before us, we detect a danger of double recovery, and in remanding, offer some elaboration on that point.
 
 
 55
 The District Court awarded plaintiffs damages in the following respects:
 
 
 56
 1. Mitchell Skidmore in his own capacity, $15,360.00 for loss of services.
 
 
 57
 2. Mitchell Skidmore, as Guardian for Mitchell Skidmore, III, $5,200.00 for loss of nurture and guidance.
 
 
 58
 3. Mitchell Skidmore, as Guardian for Claudia Howell, $2,640.00 for loss of nurture and guidance.
 
 
 59
 According to the pronouncements of the Supreme Court in Sea-Land Services, all three of these damage awards clearly fall under the title 'loss of services'. 414 U.S. at 585, 94 S.Ct. at 815, 39 L.Ed.2d at 21. Thus, the District Court must still determine the amount of recovery for the following items:
 
 
 60
 1. Loss of consortium to Mitchell Skidmore suing on his own behalf as husband of decedent.
 
 
 61
 2. Loss of society to Mitchell Skidmore, suing as Guardian on behalf of Mitchell Skidmore, III.
 
 
 62
 3. Loss of society to Mitchell Skidmore, suing as Guardian on behalf of Claudia Howell.
 
 
 63
 4. Loss of society to Teresa Howell, suing on her own behalf.[11]
 
 
 64
 In describing those interests embraced in the concept, 'loss of society', we give special notice to the Supreme Court's statement in Sea-Land Services: 'The term 'society' embraces a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort and protection', 414 U.S. at 585, 94 S.Ct. at 815, 39 L.Ed.2d at 21. For purposes of precluding double recovery we note that a recovery for loss of consortium includes loss of society. See Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 589, 94 S.Ct. 806, 817, 39 L.Ed.2d 9, 23 (1974).
 
 
 65
 We now review appellants' claim that the District Court erred in failing to allow a recovery for loss of support. Appellants base this claim on the trial court's refusal to permit recovery of Mrs. Skidmore's prospective profits from operation of the R & K pizza restaurant. The trial court felt that appellants failed to prove whether there would have been any significant profits from the business, the amount thereof, the amount of Mrs. Skidmore's participation in these profits, and if there had been any profits, whether Mrs. Skidmore would have used such profits to contribute to the support of her husband and dependent children. Without the necessity of agreeing with the trial judge in all of his conclusions.[12] we do feel that he was correct on the central issue of whether there would have been any profits.
 
 
 66
 The evidence shows that Mrs. Skidmore had operated the business for approximately four and one half months prior to her death. After her death, her husband continued to operate the business for about three and one-half months before selling it in late August. In their income tax return for 1968, Mr. and Mrs. Skidmore stated a net profit of $844.56 from the business. In his testimony, however, Mr. Skidmore stated that he lost approximately $180.00[13] during his operation of the business from mid-May until late August. Thus, it can be deduced that Mrs. Skidmore showed a net profit of approximately $1,024.56 for the five months which she operated the business. However, appellants presented no evidence of the monthly profit and loss statements;[14] thus, it cannot be determined what the profit trend was. Mr. Skidmore conceded that he did not have the talent which his wife possessed for meeting the public and he rationalized that this was a substantial cause for his inability to operate the business at a profit. Even if there is some credibility in this explanation, it is impossible to determine just how successful Mrs. Skidmore might have been, for there is no way to tell in which direction the business was heading when Mitchell Skidmore took over. On the basis of the sketchy evidence presented, any attempt to make an accurate evaluation of the future profits of the R & K restaurant after Mrs. Skidmore's death would be purely speculative. Therefore, we affirm the finding of the trial court that appellants failed to carry their burden of proof on the issue of loss of support.
 
 Conclusion
 
 67
 With respect to the District Court's holding on the issue of the barge company's liability, Mrs. Skidmore's alleged contributory negligence, dismissal of Teresa Howell's claim for loss of services, and dismissal of appellants' claim for loss of support, we affirm.
 
 
 68
 With respect to appellants' claims for loss of consortium and society, we remand the case to the District Court for further evaluation.
 
 
 69
 (APPENDIX OMITTED)
 
 
 
 [1]
 The rule of The Pennsylvania stems from a famous Supreme Court decision by the same name. The Pennsylvania, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874). In that case the Court made this significant statement concerning liability and burden of proof in collision cases when a vessel is found to have violated a statutory safety requirement:
 The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of the collision is in actual violation of the statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it was probably not, but it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute. 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874).
 As may be gathered from the above statement, a vessel in violation of a statutory requirement or regulation has indeed a ponderous burden, for it must show not only that the violation did not, in fact, cause the collision but that the violation could not have caused the collision.
 
 
 [2]
 33 C.F.R. 95.36. Lights for barges at bank or dock
 (a) Lights for barges at bank or dock in the Mississippi River and its tributaries and in the Atchafalaya River above its junction with the Plaquemine-Morgan City Alternate Waterway shall be as required by this section.
 (b) The following barges when moored in or near a fairway, except those barges exempted under the provisions of paragraph (e) of this section, shall display between the hours of sunset and sunrise the barge lights described in paragraph (c) of this section:
 (3) Barges moored in fleets more than two barges wide or to a maximum width of over 80 feet, parallel to the bank.
 (c) Barges required to be lighted under paragraph (b) of this section shall carry two white lights of such character as to be visible on a dark night with a clear atmosphere at a distance of at least 1 mile, so located as to give unobstructed view and arranged as follows:
 (2) On barges moored in group formation, a light on the upstream outboard or channelward corner of the outer upstream barge and a light on the downstream outboard or channelward corner of the outer downstream barge. In addition, any barge projecting toward or into the channel in such a group formation shall have two white lights similarly placed on the outboard or channelward corners of the barge.
 
 
 [3]
 Four witnesses were deposed to testify on the question of lights on outermost corners of OR-937. All four witnesses testified that they observed a lantern on the outermost downstream corner of OR-937, but with respect to a light on the outermost upstream corner there were definite conflicts
 John Brady, a watchman for the barge company who joined with others to rescue ms. Rowe, stated that he could not say whether there was a light on the outermost upstream corner of OR-937 before and after the collision. Brady explained that at the time of the collision he was not in a position to see the outermost upstream corner of the OR-937. At other points in his testimony, however, Brady stated that there were lights at both the outermost downstream end and the outermost, upstream end of the OR-937.
 Joseph Turley, a loader for the Ohio River Company who was also present for the rescue of Ms. Rowe, stated that he definitely observed a lantern at the outermost downstream corner of OR-937, but could not say whether there was a light at the outermost upstream corner. Turley stated that at the time of the rescue he was not in a position to see the outermost upstream corner of OR-937.
 Donald Waugh, a fleetman for the barge company, testified that he and one Jim Ratliff had responsibility for setting lanterns out on the OR-937 the night of May 17-18, 1968. Waugh stated that he placed a lantern on the outermost downstream end of the OR-937 at approximately 7:00 p.m. on May 17, 1968. Waugh claimed that he himself did not place a lantern at the outermost upstream corner of the OR-937, but went on to state that he could not recall whether or not someone else had placed a lantern at that end of the barge. Ratliff, the other Ohio employee charged with setting out lanterns on the OR-937, did not testify. He was listed as a 'may call' witness by the Ohio River Company, but was never called to give a deposition. Although appellants claim that his failure to testify should be viewed as carrying an unfavorable inference against Ohio, there is nothing in the record to show that appellants could not have had access to his testimony through normal channels of discovery.
 Clinton O. Gregory, chief warrant officer for the Coast Guard, who investigated the collision several hours after its occurrence, stated that at the time of his investigation there were two lanterns burning on the OR-937: one at the outermost downstream corner and one at the outermost upstream corner.
 
 
 [4]
 See summary of depositions in footnote 3, supra
 
 
 [5]
 In using the word 'permissible' here, we make particular reference to a previous statement by this Court on the application of the clearly erroneous rule, where we declared:
 The question is not simply whether the reviewing court would have found otherwise but whether the trial court could permissibly find as it did. The reviewing court should upset a finding only when it 'is convinced on the whole record that the finding does not reflect the truth and right of the case.' Movible Offshore, Inc. v. M/V Wilken A. Falgout, 471 F.2d 268, 271 (5 Cir., 1973), quoting in last part, C. Wright, Federal Courts 96 at 432 (2d ed. 1970).
 We note that the foregoing statement has recently been followed in the case, Oswalt v. Williamson Towing Co., 5 Cir., 1974, 488 F.2d 51, 53, and we feel that our statements today are perfectly harmonious with it.
 
 
 [6]
 The relevant Coast Guard Regulations are set forth in footnote 2, supra
 
 
 [7]
 See discussion of Pennsylvania rule in footnote 1 and accompanying text
 
 
 [8]
 This is an excerpt from Chief Warrant Officer Gregory's interrogation of Ms. Rowe on May 20, 1968:
 MR. GREGORY: Were there any lifejackets or anything in the boat?
 A. None that I saw, and they knew we could not swim; if they had had them it looks like they would have put them on us. In fact Bill told me he was not going to let me go on it if I did not have one because I could not swim and then since they evidently did not have any why he just went ahead. But they knew me or Poodles (Mrs. Skidmore) neither one couldn't swim; they knew that before we started.
 Q. What kind of boat was it? What was the color of the boat itself?
 A. It was white all I can remember, sort of white and it had maroon, a reddish maroon seats in it.
 Q. Soft were they?
 A. They was leather. Sort of reddish maroon leather.
 Q. Were they big seat covers or were they small square things?
 A. They made in something like a bucket seat in a car but they can push them down to make them out in one big seat. That is what they did; they pushed them down, made it into a big long seat.
 Q. We have a couple of lifejackets out there that were burned; they were sort of reddish.
 A. I did not see any lifejackets or anything in the boat; I mean they could have been there without me noticing them because he had stuff underneath the front of the boat.
 Q. Did you ask for a lifejacket?
 A. No I did not ask them.
 Q. Do you think Bill ask them for a lifejacket?
 A. No, I don't think Bill asked them either. I just took it they didn't have any.
 This is the only evidence in the record touching on the questions of the existence of life jackets and the issue of whether any occupants of the boat were wearing life jackets at the time of the collision.
 
 
 [9]
 The legal question presented here, to the court's knowledge, is a novel one. There are regulations which require the owner of a boat to furnish a sufficient number of life jackets to accommodate all occupants of his craft, but there is no regulation which places upon a passenger the affirmative responsibility of requesting and wearing a life jacket. See 33 C.F.R. 175.15 (1974)
 We find the situation here analogous to that of automobile seat belts, where there are statutes requiring that cars be equipped with seat belts, e.g. Miss.Code Ann. 8254.5 (Supp.1968), but no known statutes which require a passenger to use the belts. In the automobile cases the general trend is that the courts find no affirmative duty on the passenger to wear a seat belt, but allow evidence of his failure to wear one to be admitted on the issue of contributory negligence, avoidance of consequences and mitigation of damages. For a thoroughgoing review of the automobile seat belt cases, see Annot., 'Automobile Occupants' Failure to Use Seat Belt as Contributory Negligence', 15 A.L.R.3d 1428 (1967).
 
 
 [10]
 The interests involved in loss of society and loss of consortium are very closely related. Indeed, the only difference between the two might be that loss of society involves those losses of intimacy and companionship which stem from the familial relationship, while loss of consortium involves loss of those similar interests which stem from the marital relationship. In any event, to hold in the same case that a decedent's child is entitled to recover loss of society, but that decedent's husband cannot recover for loss of consortium would be judicial hair-splitting carried to its extreme and would be in utter defiance of the spirit of Sea-Land Services
 Historically, the problem of awarding damages for loss of consortium or loss of society in these maritime wrongful death actions goes back to Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). In that case the Supreme Court recognized the maritime wrongful death remedy, but left open questions of damages for resolution in future cases, 398 U.S. at 408, 90 S.Ct. 1772. In doing so the Court instructed the lower courts to look to both federal and state wrongful death remedies for guidance. Id., the damages problems, however, were not easily resoluble, and a general trend developed which allowed recovery for 'pecuniary losses' (loss of support, loss of services and funeral expenses), but denied recovery for those losses considered to be 'nonpecuniary' in nature (loss of society and loss of consortium). See e.g., Canal Barge Co. v. Griffith, 5 Cir., 1973, 480 F.2d 11, 29-34; Simpson v. Knutsen, O.A.S., 9 Cir., 1971, 444 F.2d 523, 525; In re United States Steel Corp., 6 Cir., 1970, 436 F.2d 1256, 1278, cert. denied sub nom. Lamp v. United States Steel Corp., 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971). In Sea-Land Services, however, the Supreme Court rejected the distinction between pecuniary and nonpecuniary losses, and ruled that recovery for loss of society should be allowed, 414 U.S. at 585-590, 94 S.Ct. 806. In passing, the Court noted that the argument against permitting recovery for loss of society on the basis that such damages are speculative and difficult to determine was without merit; the Court noted that for years juries and judges have been called upon to assess equally speculative damages in determining awards for common law loss of consortium. Thus, the nonpecuniary loss distinction having been totally discredited in Sea-Land Services, there remains virtually no defensible position opposing a recovery for loss of consortium in maritime wrongful death cases. Looking to state and federal analogies as we were instructed to do under Moragne, we find that loss of consortium is a common element of damages in the majority of wrongful death actions. See S. Speiser, Recovery for Wrongful Death (1972 Supp); Comment, Wrongful Death Damages in North Carolina, 44 N.C.L.Rev. 402 (1966); Annot., 'Wife's Right of Action for Loss of Consortium', 36 A.L.R.3d 900 (1971); Annot., Husband's Right to Damages for Loss of Consortium Due to Personal Injury to Wife, 133 A.L.R. 1156 (1941). Therefore, we conclude that loss of consortium must become a part of the maritime wrongful death recovery as well, in order to implement the instructions given in the Moragne and Sea-Land Services decisions.
 
 
 [11]
 In the lower court, the claim of Teresa Howell was dismissed completely. In view of Sea-Land Services, however, we rule that she is entitled to recover for loss of her mother's society. In permitting this recovery, we recognize that an adult offspring is within the class of plaintiffs intended to be vindicated in maritime wrongful death actions. Following the suggestion of Moragne v. States Marine Lines, 398 U.S. 375, 408, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) that we look to federal and state law to determine the limits of the maritime wrongful death remedy, we find that a child of the deceased is within the class of beneficiaries under the Jones Act, the Death on the High Sea Acts, and most state wrongful death acts. See 46 U.S.C.A. 688 (1970), incorporating by reference, 45 U.S.C.A. 51 (1970); 46 U.S.C.A. 761 (1970); S. Speiser, Recovery for Wrongful Death (1966)
 With respect to any claim by Teresa Howell for loss of nurture and guidance (loss of services), we affirm the District Court. There is no substantial evidence in the record indicating that Teresa Howell, an adult at the time of her mother's death, suffered any loss with respect to services. Under these circumstances, the District Court properly dismissed her claim.
 
 
 [12]
 From the testimony of Mitchell Skidmore, the degree of Mrs. Skidmore's participation in the profits as well as her intended use of the profits seems fairly clear. Mr. & Mrs. Skidmore bought the R & K restaurant in January, 1968, and from that time until her death in mid-May, Mrs. Skidmore was in sole charge of the business. Her husband took no part in its management and knew nothing about the receipts. These facts indicate that Mrs. Skidmore's participation in the profits was 100%
 In addition, Mr. Skidmore's testimony tends to show that the major part of the profits would be used for the support of their family. The Skidmore's were a family of modest means, and Mitchell Skidmore's testimony indicates that his wife's going into the restaurant business was intended to bolster their income and savings. Skidmore stated that he and his wife had planned that she operate the restaurant for only five years. By that time they projected that they would have a fair amount of profit to provide them with a solid financial cushion to Skidmore's modest salary as a truck driver. Therefore, even though Skidmore stated at one point that he didn't know what his wife did with the profits, there is substantial evidence indicating their intended use. From this a reasonable calculation of Mrs. Skidmore's contribution to the support of her family could be made.
 However, irrespective of the establishment of these facts, Skidmore failed to present substantial and persuasive evidence on the critical issue of whether the restaurant business would have realized any significant profits over the five years of intended operation.
 
 
 [13]
 We arrive at the figure $180.00 by noting that in late June, and also in July, Skidmore had to take $80 and $100 respectively out of his salary as a truck driver to meet restaurant expenses
 Appellants argue in their brief that an additional $250.00 should be added to Skidmore's losses because of a loss he was forced to take on the sale of his Labor Day beer inventory. However, this loss was incurred as a result of Skidmore's bargaining to sell the business, and thus it cannot be considered a loss incurred in the ordinary operation of a business. We may note that appellants may have been motivated to classify this loss on sale of inventory as an ordinary loss because to do so would have boosted the profit attributable to Mrs. Skidmore's operation of the business. However, this argument by appellants fails to come to grips with the real nature of the loss which was incurred.
 
 
 [14]
 Although the profitability of the restaurant was the central issue in appellants' effort to recover for loss of support, very little evidence was presented on this point. Appellants relied solely on the 1968 tax return of Vagelean and Mitchell Skidmore and Mitchell Skidmore's testimony on his operation of the business. Even though appellants knew the identity of Mrs. Skidmore's accountant, no effort was made to obtain information from him on the monthly profit and loss statements. Nor did appellants make an attempt to ascertain whether Mrs. Skidmore's personal business records were still in existence and where they might be found. The scarcity of evidence presented by appellants on this key issue may indicate that other evidence, if presented, would have been unfavorable