In the Matter of the Complaint of PATTON–TULLY TRANSPORTATION COMPANY, Owner of the MI–183–WR for Exoneration From or Limitation of Liability,

**PATTON–TULLY TRANSPORTATION COMPANY, Appellant,**

v.

**Patricia June RATLIFF, Administratrix of the Estate of Tommy Lee Ratliff, Deceased, Appellee.**

No. 85–4539.

United States Court of Appeals, Fifth Circuit.

Aug. 15, 1986.

Rehearing and Rehearing En Banc Denied Sept. 9, 1986.

William G. Beanland, Vicksburg, Miss., for appellant.

William M. Bost, Jr., Ellis, Braddock & Bost, Gerald E. Braddock, Vicksburg, Miss., for appellee.

Before WISDOM, JOHNSON and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

We are asked to review district court determinations that an employee who died in the swamping of a 16–foot skiff was a Jones Act seaman, and that his employer was not entitled to a limitation of liability under 46 U.S.C. § 183(a) because it had privity or knowledge of the condition that caused the accident. We are also asked to review the appropriateness and amount of several components of the damage award. We affirm as not clearly erroneous the district court's findings on the issues of seaman status and limitation of liability, and uphold the damage award.

## I

Patton-Tully, the marine subsidiary of the Anderson-Tully Company, a Mississippi corporation, is primarily engaged in loading harvested timber on barges at various points along the Mississippi river and its tributaries, and transporting the timber to mills in Vicksburg with the aid of tugboats. It also operates a salvage operation for boats and barges that collide, strand or sink in the Mississippi River, as well as a boat and barge repair facility at the mouth of the Yazoo Diversion Canal for its own barges and barges left at Vicksburg for unloading by other owners.

In 1979, Patton-Tully hired Tommy Lee Ratliff, a 16–year old resident of Mississippi, and assigned him to a maintenance crew at the Yazoo Canal repair facility, where he performed "dock work" involving repair of tied-off barges, and salvage work. Ratliff quit Patton-Tully in May 1980, but returned in September 1980, and worked continuously for the company until his death. After his return, Ratliff spent an increasing percentage of his working time in salvage operations away from the Vicksburg area.

In March 1981, Patton-Tully sent boats and land-based equipment to a place on the Mississippi River known as Diamond Point, to load and transport about 1,200,000 board feet of hardwood timber to the lumber mills before a falling water level prevented moving the logs through a nearby chute. The working vessels included two tugboats, a derrick boat, a crane barge, eight log barges, and a 16 ft. aluminum skiff powered by a 20 h.p. motor, used to transport workers to and from the job site.

Work proceeded for several days without incident. After the last of the barges was loaded, all the vessels made for the center of the river, and a deck hand from one of

the tugboats, James Jernigan, told the remaining six workers that he would take them back across the river in the skiff, which had a rated capacity of 1,080 pounds. Jernigan and the six men (several weighing over 200 pounds) embarked in the skiff with suitcases and other gear.

A strong southwesterly wind was blowing, causing the river to chop with short, steep waves. Jernigan, inexperienced at operating the skiff, steered a diagonal course toward the opposite bank despite instructions from a more experienced operator aboard to steer directly across the river. As the skiff came within 150 yards of the Mississippi shore, it encountered particularly rough water. Jernigan turned the bow into the waves and reduced the throttle, lowering the bow and causing the skiff to swamp and overturn. All the men, who were wearing life-jackets, were thrown into the water. Ratliff and another man, Kelly, immediately began swimming to shore. Kelly heard Ratliff cry for help, but was unable to assist him. Kelly reached shore, as did two of the other men, but Ratliff did not. The remaining men were rescued by the tugboat after Kelly telephoned the Patton-Tully dispatcher, who radioed the tug for help.

After the accident, Patton-Tully filed a complaint for exoneration from or limitation of liability under 46 U.S.C. § 185 and Rule F of the Supplemental Admiralty Rules. The court allowed an *ad interim* stipulation that the value of the skiff was $1,200. Soon thereafter, Ratliff's mother, the administratrix of his estate, filed a claim under the Jones Act for loss of her son's life. She moved pursuant to Rule F(7) to increase the limitation fund to $641,-200.00, the value of all the vessels making up the flotilla assigned to the log-loading operation. The district court entered an order determining that Ratliff was a Jones Act seaman, and expanding the shipowner's liability to the requested amount. Patton-Tully appealed the order. In *Matter of Patton-Tully Transport Co.*, 715 F.2d 219 (5th Cir.1983), a panel of this court held that the determination of seaman status was interlocutory and not then appealable. The panel also vacated the order increasing the limitation fund, holding that the district court's finding that Patton-Tully had failed to establish lack of privity or knowledge was inconsistent with its order on limitation of liability. *Id.* at 223; *see* 46 U.S.C. § 183(a).

On remand, the case was reassigned to a new district court judge, because the original trial judge took senior status during the appeal. Rather than holding a new trial, the parties submitted the case for decision on the existing record, with a stipulation to add further testimony by an economist earlier qualified as an expert for the plaintiff. The district court found that if limitation of liability was proper, the fund of $1,200.00 was grossly inadequate and should be increased to $890,400.00, the total value of the vessels participating in the logging operation, and their freight then pending (the hire of the vessels). However, the court held that liability should *not* be limited because the company was charged with the actual or constructive knowledge of its general manager, Odis Lowery, that six workers would be travelling in the skiff. The court also found that Ratliff was a seaman, that the skiff operator was negligent, that Ratliff was not negligent, and that the skiff was unseaworthy at the time of the accident. The court awarded total damages of $315,-324.91.[1]

## II

The principal issue in this appeal is whether the district court correctly deter-

---

1. This figure included the following elements:

| | |
|---|---|
| Loss of economic support | 7,050.60 |
| Prospective loss (discounted to prevent value) | 160,767.31 |
| Funeral expenses | 2,507.00 |
| Conscious pain and suffering by Tommy Ratliff | 40,000.00 |
| Loss of services to the family | 25,000.00 |
| Mother's loss of society | 40,000.00 |
| Brother's and sister's combined loss of society | 40,000.00 |
| TOTAL | $315,324.91 |

mined that Ratliff was a "seaman" entitled to maintain an action under the Jones Act. *See* 46 U.S.C. § 688. In *Barrett v. Chevron, U.S.A., Inc.*, 781 F.2d 1067 (5th Cir. 1986) (en banc), we recently reaffirmed that the question of seaman status is to be resolved under the two-part inquiry first enunciated in *Offshore Company v. Robison*, 266 F.2d 769 (5th Cir.1959). That inquiry involves determining whether (1) the injured worker was assigned permanently to a vessel or performed a substantial part of his work on a vessel or on "an identifiable group of vessels acting together or under one control," *Barrett*, 781 F.2d at 1074; and (2) whether the work he performed contributed to the function of the vessel, the accomplishment of its mission, or to "the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips." *Id.* at 1072 (quoting *Offshore Company v. Robison*, 266 F.2d 769, 779 (5th Cir.1959)).

Applying the *Robison* test for seaman status requires making a determination on an "inherently factual question." *Barrett*, 781 F.2d at 1074. Where the facts do not establish lack of seaman status beyond question as a matter of law, the status determination is one for the fact-finder. *Id.* We have observed that although the application of a legal standard to a wide variety of factual situations "may inevitably result in some inconsistent determination[s] of status.... [t]he Supreme Court, which *Robison* followed, accepts these inconsistencies." *Id.* Therefore, insofar as the district court applied the correct legal standard to the found facts, we are bound by the clearly erroneous rule in reviewing its determination of seaman status. *See* Fed.R.Civ.P. 52(a).

■ In this appeal, Patton-Tully argues that Ratliff did not meet the first prong of the *Robison* test because he did not perform a substantial portion of his work aboard vessels. Patton-Tully submitted a summary of Ratliff's working hours at trial showing that over the course of his entire employment he spent 34% of his time

doing salvage work, and 66% doing dock work. However, the district court found that Ratliff's fleeting and salvage work for Patton-Tully itself, as opposed to that for outside customers, was actually charged to dock work. Adjusted to include salvage work for Patton-Tully, the district court found that at least 51% of Ratliff's hours during the final six months of his employment consisted of seaman's work. Patton-Tully points to nothing that calls into question this finding, and we hold that the district court's conclusion that Ratliff performed a substantial portion of his work aboard vessels was not clearly erroneous.

■ However, the question arises whether the district court correctly examined only the division of Ratliff's work between land and vessels during the six month period of employment prior to his death, rather than over his total work history. Because of the four-month gap in Ratliff's employment, the final six months was the "employment term" relevant to the *Robison* determination. Although *Barrett* stated that seaman status is to be "determined 'in the context of [an employee's] *entire* employment' with his current employer," 781 F.2d at 1075 (quoting *Longmire v. Sea Drilling Corp.*, 610 F.2d 1342, 1347 (5th Cir.1980) (emphasis added)), this statement referred to an employee who had worked continuously over an entire year. The district court correctly found on the facts of this case that the four-month hiatus in Ratliff's employment was a significant break requiring separate evaluation of his duties during the re-employment period.

■ Patton-Tully also argues that Ratliff fails the first prong of the *Robison* test because his work was not aboard an identifiable group of vessels, as the boats and barges owned by Patton-Tully were allegedly engaged in four separate businesses. The district court found that the Vicksburg works included only "a relatively small number of vessels which constitute 'an identifiable group,'" and we have held that work aboard a number of vessels under common ownership or control may establish Jones Act coverage. *See Bertrand v.*

*International Mooring and Marine, Inc.,* 700 F.2d 240, 244–245 (5th Cir.1983), *cert. denied,* 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984); *Barrett,* 781 F.2d at 1074. Patton-Tully cites no authority for the proposition that all vessels in a fleet under single ownership must also be dedicated to the same endeavor. The district court's finding that Ratliff worked aboard an identifiable group of vessels was not clearly erroneous.

■ Finally, as to the second prong of the *Robison* test, Patton-Tully argues at length that while aboard the vessels, Ratliff was "a longshoreman, salvor, stevedore, harbor worker or ship-repairer," but that "[o]nly on the rare occasions when he filled in for a missing deckhand on one of the harbor boats was he a sailor." In *Barrett* we expressly rejected the suggestion that we reform the *Robison* test "to grant crew member status only to those workers who perform significant navigational functions or further the 'transportation function' of the vessel." *Barrett,* 781 F.2d at 1073. Because Ratliff's duties as a salvor, log-loader, and ship-repairer contributed to the accomplishment of the salvage and logging missions Patton-Tully's vessels were performing while he was aboard, the district court's conclusion that Ratliff met the second prong of the *Robison* test as well as the first was not clearly erroneous. Ratliff was correctly permitted to maintain this action as a seaman.

### III

■ Patton-Tully argues that the district court should have allowed the company to limit its liability from this accident to $1200.00, the value of the aluminum skiff involved. Under 46 U.S.C. § 183(a), a shipowner may limit his liability to his interest in the vessel where he was without "privity or knowledge" of the cause of the loss.[2]

The burden of proof is on the shipowner to prove lack of privity or knowledge of the negligent or unseaworthy condition. *Coryell v. Phipps,* 317 U.S. 406, 409, 63 S.Ct. 291, 292, 87 L.Ed. 363 (1943).

■ Patton-Tully argues that the "privity or knowledge" standard requires *actual* knowledge by a vessel owner of the unseaworthy condition or negligent act that causes a loss. While this argument might have some force in the case of an individual owner of a vessel, *see, e.g., Coryell,* 317 U.S. at 410–412, 63 S.Ct. at 293–294, the question with regard to corporate owners is not what the corporation's officers and managers *actually* knew, but what they objectively *ought* to have known. G. Gilmore & C. Black, *The Law of Admiralty* (2nd Ed.1975) at 886. The measure of the scope of this subjective knowledge has been explained in terms of a corporation's duty to exercise control over its vessels to the extent reasonably possible. *Id.* at 886–895. The Supreme Court discussed this duty in *Spencer Kellogg & Sons, Inc. v. Hicks,* 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932), in which, ironically, a company was ferrying employees across the Hudson River in a motor launch. While operating on a day when ice had formed, the launch ran into an ice floe and sank, causing considerable loss of life. The Court assumed that the company works manager was sufficiently high in the corporate hierarchy so that his "privity or knowledge" would be chargeable to the corporation. The difficulty, as in the present case, was that the manager did not subjectively know anything about the launch's use on the fatal day. The Court held that "[t]he conditions on the morning in question could have been ascertained by [the manager], if he had used reasonable diligence, and we think the evidence is adequate to support the finding

**2.** Section 183(a) provides:
The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, mat-

ter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

that the negligence which caused the disaster was with his, and therefore with the owner's privity or knowledge." 285 U.S. at p. 512, 52 S.Ct. at p. 453.

■ In the present case, Patton-Tully concedes that Odis Lowery, the ship owner's general manager in charge of the log loading operation, was the person whose knowledge would be chargeable to the corporation. Patton-Tully argues, however, that because the accident occurred after Lowery left the job site, the unseaworthiness of the vessel caused by overloading and Jernigan's negligence in piloting it were not within his knowledge. The district court held that Patton-Tully failed to carry its burden of proof on the issue of lack of privity or knowledge, finding that although Lowery was not actually present when Jernigan transported the men across the river, it was evident that the employees needed transportation back to the landing where their automobiles were parked, and foreseeable that Jernigan would use the skiff to transport them, as he had Lowery and other supervisory employees on two earlier trips. These findings of fact were not clearly erroneous. As manager of the logging operation, Lowery was charged with the duty of ensuring that the skiff transporting his men to shore was not operated negligently or in an unseaworthy condition. See Spencer Kellogg, 285 U.S. at 510–511, 52 S.Ct. at 452–453. The district court correctly concluded that Patton-Tully, by virtue of Lowery's failure to oversee the work and ensure safe transportation of its employees, as well as to provide a competent crew, had privity and knowledge as to the conditions leading to the accident, and was not entitled to limitation of liability under 46 U.S.C. § 183(a).

## IV

Patton-Tully disputes the propriety of the awards for loss of services to the entire Ratliff family, and for loss of society to Ratliff's younger brother and sister. Patton-Tully argues that the Jones Act does not authorize an award to an inferior class of beneficiaries where there exists a pre-ferred class, and that because Ratliff was survived by his mother, his other dependent relatives should be precluded from receiving damages. See 46 U.S.C. § 688; 45 U.S.C. § 51.

■ The district court's award, however, was based not only on the Jones Act, but on a claim under general maritime law for unseaworthiness. Patton-Tully apparently does not dispute the district court's finding that the skiff was unseaworthy, or the general propriety of awarding non-pecuniary losses under an unseaworthiness claim based on general maritime law. Moreover, we have held that "[w]hen a death is caused in territorial waters by unseaworthiness, the survivors of a seaman may recover damages for a loss of society under general maritime law in addition to any recovery permitted by the Jones Act." Smith v. Ithaca Corp., 612 F.2d 215, 226 (5th Cir.1980); see also Hlodan v. Ohio Barge Line, Inc., 611 F.2d 71, 74–75 (5th Cir.1980).

The issue, then, is whether general maritime law allows both Ratliff's mother and siblings to recover damages for loss of services and loss of society, or whether, as under the Jones Act, only one class of beneficiaries may recover. In Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), the Supreme Court overruled a line of its own cases and held that an action for wrongful death based on unseaworthiness is maintainable under general maritime law. See generally Sistrunk v. Circle Bar Drilling Co., 770 F.2d 455, 456–458 (5th Cir.1985) (summarizing the development of the general maritime law cause of action for wrongful death in Supreme Court jurisprudence), cert. denied, —— U.S. ——, 106 S.Ct. 1205, 89 L.Ed.2d 318 (1986). The court expressly left unresolved "the determination of the beneficiaries who are entitled to recover" in wrongful death actions under general maritime law. Moragne, 398 U.S. at 406, 90 S.Ct. at 1791. The Court declined to borrow a schedule of beneficiaries from

any analogous federal act,[3] holding that final resolution of the issue "should await further sifting through the lower courts in future litigation." *Id.* at 408, 90 S.Ct. at 1792.

Following *Moragne,* the Supreme Court held in *Sea-Land Services, Inc. v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), that the maritime wrongful death remedy permits recovery of damages by "dependents" of maritime death victims, for loss of support, services, and society, as well as damages for funeral expenses. *Gaudet* emphasized that "the policy underlying the remedy is to insure compensation of the dependents for *their* losses resulting from the decedent's death." *Id.* at 583, 94 S.Ct. at 814 (emphasis in original). In determining that loss of society damages should be permitted in a general maritime award for wrongful death, the Court observed that the "term 'society' embraces a broad range of mutual benefits *each family member receives* from the others' continued existence...." *Id.* at 585, 94 S.Ct. at 815 (emphasis added). Although this court has held since *Gaudet* that non-dependent parents of maritime wrongful death victims may not recover damages for loss of society, *Sistrunk v. Circle Bar Drilling co.,* 770 F.2d 455, 460 (5th Cir. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1205, 89 L.Ed.2d 318 (1986), we are aware of no case from this circuit questioning *Gaudet's* implication that all *dependents* may recover such damages. Indeed, in past cases involving general maritime claims, we have allowed awards in one action to spouses and both dependent and non-dependent children. *See Skidmore v. Grueninger,* 506 F.2d 716, 729 n. 11 (5th Cir.1975); *Law v. Sea Drilling Corp.,* 510 F.2d 242 (5th Cir.1975).

In this case, it is clear from the record that apart from social security benefits received by Tommy Ratliff's mother, he was the family's sole source of income, and its members were his dependents.

Where a family unit is maintained by dependence on a single family member, each of the dependents may recover for their losses in a *Moragne* wrongful death claim under general maritime law. The district court correctly awarded damages for loss of services and loss of society to both Ratliff's mother and to his brother and sister.

Patton-Tully also argues that the district court erroneously failed to reduce the prospective loss of support award to reflect the possibility that Ratliff would marry in the future. *See Standard Products v. Patterson,* 317 So.2d 376, 379 (Miss. 1975) ("A young man can reasonably be expected to marry, and it is unreasonable to expect that he would give his mother one-half of his earnings during his entire life."). The district court correctly distinguished *Patterson,* because in that case both parents were gainfully employed, whereas Ratliff's father was deceased, and his mother was unemployed. Patton-Tully offered no evidence to establish that if Ratliff married, he would not have continued to support his family, and the district court noted that there were no witnesses or evidence from which the court might meaningfully "apply any probability of marriage to the computation of loss of support in this case." Absent such evidence, the amount of the award for prospective loss of support was not excessive.

AFFIRMED.

---

3. The Jones Act, 46 U.S.C. § 688; 45 U.S.C. § 51; the Death on the High Seas Act, 46 U.S.C. §§ 761, 762; or the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 909.